Philip A. Garland
P.O. Box 33934
Las Vegas, Nevada 89133
(702) 658-5918
Plaintiff
In Pro Se

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PHILIP A. GARLAND ) | |
| ) | |
| Plaintiff, ) | **District Ct. No. 080151RCL** |
| ) | |
| ) | **PBGC Appeal No. 2007-0141** |
| v. ) | |
| ) | **PBGC Case No. 199334** |
| PENSION BENEFIT GUARANTY ) | |
| CORPORATION, ) | |
| A wholly owned government corporation, ) | |
| ) | **(JURY TRIAL REQUESTED AND DEMANDED)** |
| Defendant. ) | |
| _____ ) | |

**AMENDED COMPLAINT**

**COMES NOW**, PHILIP A. GARLAND, PLAINTIFF, (hereinafter PLAINTIFF

GARLAND), In Pro Se, who hereby brings his amended complaint against the PENSION BENEFIT

GUARANTY CORPORATION, DEFENDANT, (hereinafter DEFENDANT PBGC). PLAINTIFF

GARLAND complains and alleges, as follows:

**JURISDICTION**

1.     This action arises under Title IV of the Employee Retirement Income Security Act of

1974 (hereinafter ERISA), 29 U.S.C. § 1301 et seq. Jurisdiction is conferred on this court by reason

of Title 26 U.S.C.A. § 401 and all subparagraphs, and Title 29 U.S.C.A. § 411, and all

subparagraphs, and Title 29 U.S.C.A. § 1132(e)(1), 29 U.S.C. § 1303(e)(3). All of the acts

complained of in this action occurred within the jurisdiction of the United States District Court for

the District of Columbia District of the State of Washington.

# RECEIVED

FEB 4 - 2008

1

**JURY TRIAL**

2.      Request and demand for trial by jury pursuant to 29 USC § 185.

**PARTIES**

3.      At all times mentioned, PLAINTIFF GARLAND was and is a resident at 7125 Regina Avenue, in the City of Las Vegas, County of Clark, State of Nevada.

4.      At all times mentioned, DEFENDANT PBGC was a wholly owned government corporation established under Section 4002 of ERISA, 29 U.S.C. § 1302, to administer the pension plan termination insurance program created by Title IV of the ERISA.

5.      DEFENDANT PBGC'S principal function is to provide for the timely and uninterrupted payment of pension benefits to participants and beneficiaries under plans to which Title IV of the ERISA applies, ERISA § 4002(a)(2), 29 U.S.C. § 1305(a)(2), by guaranteeing the payment of certain basic pension benefits after termination of a plan covered under Title IV, ERISA §§ 4022, 4061, 29 U.S.C. §§ 1322, 1361.

6.      The Appeals Board of DEFENDANT PBGC is authorized by 29 C.F.R. Part 4003 to independently review specific issues raised in appeals that relate to whether DEFENDANT PBGC calculated and determined benefits properly under pension plan provisions and applicable law and regulations.

7.      At all times mentioned, US Airways, Inc. (hereinafter US Airways), US Airways Pilots Retirement Income Plan and US Airways Pilots Disability Income Plan are duly organized and existing qualified trust pension plans as defined in Title 26 U.S.C.A. § 401, and all subparagraphs, and Title 26 U.S.C.A. § 411, and all subparagraphs.

8.      The pension plan termination insurance program created by Title IV of the ERISA is not financed from federal tax revenues. DEFENDANT PBGC pays guaranteed benefits to retirement and disabled employees and their beneficiaries. Specifically, the money for those benefits comes from the terminated plan's assets and amounts recovered from employers as described below,

supplemented by withdrawals from the revolving funds that support all DEFENDANT PBGC operations. ERISA §§ 4005, 4061, 29 U.S.C. §§ 1305, 1361. Those revolving funds are principally comprised of premiums paid by all the private pension plans to which Title IV applies, ERISA §§ 4005 to 4007, 29 U.S.C. §§ 1305 to 1307. DEFENDANT PBGC is required "to maintain premiums . . . at the lowest level consistent with the discharge of DEFENDANT PBGC'S statutory responsibilities, ERISA § 4002(a)(3), 29 U.S.C. § 1302(a)(3).

9.      The US Airways Pilots Retirement Income Plan and US Airways Pilots Disability Income Plan and such plan qualified trust was designed and intended to qualify under all of the requirements of Sections 401(a) and 501(a) of the United States Internal Revenue Code, Title 26 (26 U.S.C.A. § 401(a), 26 U.S.C.A. § 501 (a)).

10.     At all times mentioned, PLAINTIFF GARLAND is and was a qualified and vested participant in the US Airways Pilots Retirement Income Plan and US Airways Pilots Disability Income Plan, and such qualified trust.

11.     The US Airways Pilots Retirement Income Plan terminated on March 31, 2003, at which time the Plan was covered under Title IV of the ERISA.

12.     On March 31, 2003, the date of US Airways Pilots Retirement Income Plan termination, the amount of the retirement Plan's insufficiency was in an amount less than 30 percent of the employer's net worth as determined by DEFENDANT PBGC pursuant to Section 4062(d)(1) of the ERISA, 29 U.S.C. § 1362(d)(1).

13.     US Airways had neglected or refused to pay their liability to DEFENDANT PBGC. Since that time a lien has arisen in favor of DEFENDANT PBGC upon al property and rights to property, whether real or persona, belonging to US Airways. ERISA § 4068(a), 29 U.S.C. § 1368(a). Pursuant to Section 4068(b) of the ERISA, that certain lien arose as of March 31, 2003, the date of Plan termination. DEFENDANT PBGC adopted the US Airways Pilots Retirement Income Plan and US Airways Pilots Disability Income Plan on March 31, 2003.

## CAUSE OF ACTION

14.     PLAINTIFF GARLAND became an employee of US Airways on November 13, 1982, after he filed a charge of racial discrimination with the equal employment opportunity commission.

15.     On or about November 19, 1976, PLAINTIFF GARLAND had been issued a letter of proficiency by the FAA (Federal Aviation Administration) pursuant to receiving ATP Certificate no. 564803711 (Airline Transport Pilot). He was only 22 years old and too young to be issues an ATP certificate.

16.     On or about April 5, 1977, PLAINTIFF GARLAND reached his 23rd birthday and was issued the airman certificate.

17.     On or about February 28, 1977, PLAINTIFF GARLAND had been employed as a second officer by Western Airlines, Inc. PLAINTIFF GARLAND had no history of violations or accidents. Western Airlines had been experiencing financial difficulty and PLAINTIFF GARLAND furlough was imminent.

18.     On July 31, 1981, PLAINTIFF GARLAND applied for a pilot position with US Airways.

19.     On or about October 20, 1982, PLAINTIFF GARLAND was interviewed and successfully passed all phases to include a simulator pre-employment flight check.

20.     On November 13, 1984, PLAINTIFF GARLAND filed a complaint with the equal employment opportunity commission (EEOC). Immediately thereafter PLAINTIFF GARLAND had been hired as a pilot by US Airways.

21.     On or about February 28, 1985, the Chairman of ALPA'S Professional Standards Committee (white) identified PLAINTIFF GARLAND as the (black) pilot suing the company and told PLAINTIFF GARLAND that said ALPA was concerned about employees who complained about or sued US Airways. He further informed PLAINTIFF GARLAND he would be summarily

denied union membership, that captains would not permit him to fly, and that the ALPA would not diligently represent PLAINTIFF GARLAND.

22.    On or about March 1, 1985, GARLAND wrote US Airways' "Vice President-Flying," informing him of the above threats. US Airways took no action to remedy situation.

23.    On or about March 25, 1985, and again on or about June 22, 1985, the Regional Director of Flying accused PLAINTIFF GARLAND of being unavailable for a flight. Each accusation was later proved to be untrue. On or about March 25, 1985, US AIRWAY'S Vice-President-Flying orally demanded that PLAINTIFF GARLAND rein his seniority rights with Western Airlines, Inc., his prior employer.

24.    On or about April 2, 1985, PLAINTIFF GARLAND filed an EEOC charge of retaliation against US Airways and ALPA. Shortly thereafter, PLAINTIFF GARLAND'S mailbox was continuously vandalized, preventing PLAINTIFF GARLAND from obtaining work-related manuals.

25.    On or about April 10, 1985, US AIRWAY'S Vice President-Flying demanded in writing that PLAINTIFF GARLAND reign said seniority rights.

26.    On or about December 1985 US Airways continued to make unreasonable and unconscionable verbal demands for resignation of said rights. PLAINTIFF GARLAND, under protest, resigned from said rights.

27.    On or about June 26, 1984, the Captain with whom PLAINTIFF GARLAND was scheduled to fly demanded to know whether PLAINTIFF GARLAND was the only one suing the company. The next day this Captain refused to fly with PLAINTIFF GARLAND and left the plans. Within a week thereafter, this Captain again refused to fly with PLAINTIFF GARLAND, US Airways Regional Director of Flying removed PLAINTIFF GARLAND from the flight of the said captain. PLAINTIFF GARLAND notified US Airways. No remedy was undertaken.

28.     On or about July 1985, Captain Gary Borck shockingly and impermissibly pursuant to F.A.A. (Federal Aviation Administration) rules in violation of safe airline operations did while in flight and immediately after T/O and before flaps were raised he put his important captain flying duties second to his desire to harass and intimidate and otherwise retaliate against PLAINTIFF GARLAND'S mid-flight. Captain Borck informed PLAINTIFF GARLAND that he hoped PLAINTIFF GARLAND would lose his civil rights suit against the company. The true facts are that at the time of such incident GARLAND had only filed an EEOC complaint and had not filed a civil lawsuit.

29.     On October 2, 1985, the EEOC issued a probable cause letter finding substantial evidence of racial discrimination and retaliation. The EEOC attempted conciliation and settlement. US Airways and ALPA refused to settle the complaint informally as preferred and provided by statue.

30.     On or about November 26, 1985, PLAINTIFF GARLAND was scheduled for his probationary examination on a flight simulator. Upon taking the examination, PLAINTIFF GARLAND noticed that several switches and circuit breakers were changed from the normal setting. PLAINTIFF GARLAND is informed and believes, and thereon alleges, that said dials, switches and circuit breakers were intentionally set in an unusual fashion in order to obtain his failure in this examination.

31.     On or about January 28, 1986, the Local Chairman for ALPA announced to the membership that it would vote on awarding to "apprentice members," including PLAINTIFF GARLAND "full membership." PLAINTIFF GARLAND is informed and believes thereon alleges, that said Local Chairman then prefaced the vote by stating that he believed that PLAINTIFF GARLAND was suing the company. The ALPA membership voted against admitting PLAINTIFF GARLAND. PLAINTIFF GARLAND had made no application for ALPA membership at the time of the vote.

32.     On or about March 20, 1986, the issue of PLAINTIFF GARLAND'S admission to "full membership" in ALPA was again submitted to the ALPA membership. Again agents of ALPA prefaced the vote by informing the membership of PLAINTIFF GARLAND'S charges of discrimination against the company and the union. ALPA finally dropped the issues when discovering that PLAINTIFF GARLAND had been an ALPA member since 1978.

33.     On April 20, 1986, PLAINTIFF GARLAND filed a civil complaint in U.S. District Court for the Western District of Pennsylvania.

34.     On or about September 1987, PLAINTIFF GARLAND was forced to file for a temporarily restraining order (TRO) before the District Court since several US Airways Captains (white) had refused to allow PLAINTIFF GARLAND to ride the cockpit jump seat to and from work.

35.     On or about October 1987, a certain other (white) Captain Tom Fitzgerald would harass PLAINTIFF GARLAND on trips to the point that he demanded that PLAINTIFF GARLAND ask special permission for him to exit the cockpit after each trip. No other (white) pilot before or after said occurrence had been required to by US Airways policy or procedure seek a captain permission to exit the cockpit at the end of the trip.

36.     On or about April 1988, US Airways merged with Pacific Southwest Airlines, Inc., (PSA) which immediately opened up LAX and SFO as crew bases. PLAINTIFF GARLAND bid SFO and took at $2,500.00 month pay reduction to get away and otherwise escape the ongoing and continuous and on-going discrimination, retaliation and harassment PLAINTIFF GARLAND suffered from US Airways management and ALPA other (white) captains that flew out of the PIT base at US Airways.

37.     On or about May 15, 1988, this seniority adjustment permitted PLAINTIFF GARLAND to obtain an F.A.A. type rating to fly as captain on the BAE 146 aircraft. US Airways management was not pleased about such bid award to this position so that PLAINTIFF GARLAND

was denied for an extended period of time a F.A.A. required line check (IOE) to complete the final certification process as a qualified US Airways Captain.

38.    On or about April 1989 PLAINTIFF GARLAND was allowed to complete the IOE trip and was released to the line as a BAE 146 reserve captain domiciled in SFO.

39.    On or about May 1989, soon after PLAINTIFF GARLAND arrived the harassment resumed since his employment file had been sent from PIT to SFO containing a "red sticker" attached. The chief pilot's secretary in SFO, who had been former employee of PSA (Pacific Southwest Airlines merged into US Airways. On or about April 1988), she did not know the meaning or intent of the red sticker until she called Mrs. Dixie Schemalla, the lead secretary over the years for the several US Airways chief pilots. The new chief pilot secretary was informed by Ms. Schemalla that the "red sticker" was to identify an employee, PLAINTIFF GARLAND that US Airways and ALPA were jointly attempting to terminate. She said, "So do and document everything against him you can, so we can get rid of him."

40.    On or about May 5, 1989 PLAINTIFF GARLAND was summoned to the chief pilots office and threatened with termination by assistant chief pilot captain Jim Shear (white) for ordering crew meals. PLAINTIFF GARLAND was responsible for the entire operation regular or irregular or operation flight due to mechanical fault.

41.    On June 10, 1991 the Honorable Retired Chief District Court Judge Donald E. Ziegler after a 10 day bench trial found for PLAINTIFF GARLAND on his racial discrimination and retaliation claims. See Philip A. Garland v. US Air, Inc., 767 Fed. Supp. 715 (W.D.Pa 1991). A copy of the decision is attached, hereto, marked EXHIBIT #1, incorporated by this reference. See also EXHIBIT # 2-6.

42.    On or about June 1991 after having received the adjusted seniority date from the District Court several incidents of discrimination and retaliation would persist by LAX Chief Pilot Captain Greg Husar (white). He would "stalk" GARLAND to determine whether or not GARLAND

8

was then within ninety (90) minutes of the LAX crew base. On one occasion Captain Husar had crew scheduling supervisor Cheryl Hull contract GARLAND approximately 6:00am PST to see if GARLAND could make it to his office in the allotted ninety (90) minute time. GARLAND arrived on time. Later Captain Greg Husar refused to call any other (white) pilots to see if they could make it because he knew they all lived in San Diego, California, PSA former headquarters, and unable to drive the distance (109 miles) and fight the traffic within the allotted time of ninety (90) minutes, another manifestation of harassing and disparate treatment.

43.     On or about 1993, US Airways began to shut down almost the entire west Coast operation it had acquired in the PSA merger due to poor management and resultant financial woes. PLAINTIFF GARLAND was forced to return to the PIT domicile. On or about October 1994 PLAINTIFF GARLAND was subjected to further retaliation when unjustifiably and wrongfully receiving a negative evaluation on a captain DC-9 proficiency check ride (PC) issued by Check Captain Rebecca Wooley (white). GARLAND recalls that before the PC was started and during the pre-simulator briefing, check captain Wooley stated, to GARLAND that "I know who you are you the black guy who sued the company." At that point before the check ride even began, GARLAND knew that check captain Rebecca Wooley would make difference.

44.     On or about November 1994, the Asst. Chief Pilot (PIT) Captain Eric Jordon (white) who had been one of the US Airways pilots that PLAINTIFF GARLAND identified in the failure to hire case. PLAINTIFF GARLAND proved that Chief Pilot Captain Eric Jordon did not meet US Airways AND ALPA'S minimum published qualifications for new hire pilots because he had a relative working at US Airways employed as a mechanic. Chief Pilot Eric Jordon recommended that PLAINTIFF GARLAND be terminated. He had motive to get even with PLAINTIFF GARLAND and his chance to personally settle the score and he did.

45.    On or about December 1994 PLAINTIFF GARLAND was terminated.

46.    On or about February 16, 1996, PLAINTIFF GARLAND was reinstated and reported for B737 simulator training. He successfully completed the simulator training and returned to work.

47.    On or about January 1998, PLAINTIFF GARLAND received an unfair and biased simulator evaluation. PLAINTIFF GARLAND challenged the evaluation taking another check ride which he successfully completed.

48.    On or about September 21, 1999, PLAINTIFF GARLAND received his retroactive seniority rights to bid for a reserve captain position on the B757/767 aircraft.

49.    On or about June 1999, PLAINTIFF GARLAND was influenced and decided to bid the B757/767 Aircraft as a result management promised turbo or accelerated growth of the airline and corresponding increase in prime positions which would be created as a result of such growth. The B757/767 is a high paying position equipment type compared to the B-737 and a DC-9 aircraft which PLAINTIFF GARLAND flew as captain previously. PLAINTIFF GARLAND would not be able to hold this position without being the bottom captain on the B757/767 seniority list and without the benefit of a hire date of November 13, 1982, rather than December 12, 1984. PLAINTIFF GARLAND recalls that many individuals at US Airways including management and other personnel have not been happy to see GARLAND exercise his Court Ordered adjusted seniority rights obtained in the June 10, 1991 District Court Order to train and fly this particular aircraft and they would do what they could do to stop him.

50.    On or about October 27, 1999, Check Captain Joe Lafonzo who is a FAA Designee (white) granted PLAINTIFF GARLAND the Boeing 757/767 type rating. On or about October 27, 1999. Captain Lafonzo also participated in the first the remedial simulator session after the negative evaluation that took place on or about November 11, 2001. Captain Lafonzo stated that PLAINTIFF GARLAND was up to speed and current back in October 1999 but rusty, non-proficient due to a lack of flying the line and in serious and immediate need of recent flying time. Check Captain Joe

Lafonzo said he would recommend to MATHEWS, chief pilot that PLAINTIFF GARLAND is in need of some additional simulator training time. MATHEWS refused to authorize the additional simulator time to get him back up to speed and improve his overall proficiency.

51.    On or about November 1999 through September 2000, PLAINTIFF GARLAND had many conversations with F/O Tim Baker ALPA Training Committee Chairman (white) about DON MATHEWS, chief pilot PHL denying PLAINTIFF GARLAND'S request for trips to maintain his proficiency and how the lack of flying opportunity and its impact on PLAINTIFF GARLAND'S proficiency and upon the FAA mandating consolidation of learning time (COL) requiring one hundred (100) hours of flying time in the proceeding one hundred twenty (120) day period. However, OF/Baker brushed aside PLAINTIFF GARLAND'S concerns telling him not to worry that everything would be OK and to call Captain Yaroslaw Stawnychy Asst. Chief Pilots (white) and asked them about trips. PLAINTIFF GARLAND recalls that other pilots (white) who went to training with beginning of September 1999, had, with MATHEWS' approval accumulated approximately three hundred-forty (340) hours. MATHEWS upon inquiry, late admitted, in fact that some trips were bought over the Republican National Convention for (white) pilots only, but that the trips had been Airbus type equipment and not on the Boeing 757/767 to which GARLAND was trained and assigned as a stand by and reserve captain.

52.    On or about January 2000, PLAINTIFF GARLAND recalls that these times of long intervals of not flying trips put him right up against the FAA COL (consolidation of learning time). The F.A.A. COL time requires the pilot-in-command to accumulate one hundred (100) hours of flight time in type aircraft within proceeding one hundred twenty (120) days or face the penalty of returning to initial training beginning the process all over again as though PLAINTIFF GARLAND had never seen the aircraft before. On or about October 2000 PLAINTIFF GARLAND recalls that he took his first proficiency check (PC) after having received the type rating on October 27, 1999. At the time of PC on or about October 29, 2000, PLAINTIFF GARLAND had approximately one

hundred fifty (150) hours total time on the Boeing 757/767. It had been approximately forty five (45) days since his last trip, which was the SFO Red Eye on September 16, 2000. At the time of PC PLAINTIFF GARLAND had only one hundred fifty (150) hours total time on the Boeing 757/767. It had been approximately forty five (45) days since his last trip, which was the SFO Red Eye on September 16, 2000. MATHEWS deliberately and purposely placed PLAINTIFF GARLAND at a risk of losing his proficiency by denying him trips even though he personally flies approximately (50-60) hours per month with the co-pilot of his choice. MATHEWS also knows neither he or his staff ever bought him a trip to maintain PLAINTIFF GARLAND'S piloting skills as a qualified captain as US Airways AND ALPA do for other (white) pilots excluding PLAINTIFF GARLAND and other minority pilots.

53.    On or about October 2000, FAA Inspector DAVIES gave PLAINTIFF GARLAND an oral examination involving his ATP and type ratings on the B757/767. PLAINTIFF GARLAND passed. PLAINTIFF GARLAND recalls that on each and every subject matter tested that FAA Inspector DAVIES, stated that, "PLAINTIFF GARLAND did a real good job."

54.    On or about December 20, 2000, PLAINTIFF GARLAND placed a call to the National Transportation Safety Board (NTSB) and after many many attempts he finally spoke with Inspector Parker. PLAINTIFF GARLAND was seeking an objective opinion of his predicament and unusual circumstances as a reserve pilot who was only flying every couple of months. PLAINTIFF GARLAND recalls asking how safe could this practice be. PLAINTIFF GARLAND also wanted to know whether this safety issue, of he as a reserve pilot sitting on call for months and months before being assigned a trip to fly, had come before the NTSB in the past. PLAINTIFF GARLAND recalls that NTSB Inspector Rich Parker came to the telephone to see what PLAINTIFF GARLAND wanted but he still refused to tell him his name nor the airline he worked for. The only information he had before him is that PLAINTIFF GARLAND flew for a major airline and that he presently flew the B757/767 as a reserve captain with very low time on the aircraft accompanied by long intervals

of periods of time containing no flying and when flying is assigned that the trip assured to
PLAINTIFF GARLAND would usually be a "Red Eye" flight. PLAINTIFF GARLAND recalls that
he also informed Inspector Parker that he had received negative evaluations on proficiency check
rides by US Airways check pilots and that the company he worked for would only offer him five (5)
hours of remedial training and retake the check ride (PC). PLAINTIFF GARLAND wanted to know
if he personally believed that this would be adequate remedial training under these circumstances,
and whether or not his working environment was safe according to NTSB standards for safe
operating practices in the commercial airline industry. PLAINTIFF GARLAND recalls informing
NTSB Inspector Rich Parker that he only had a total of one hundred fifty (150) hours since obtaining
the type rating over one (1) year ago and that he was concerned that he might have difficulty
maintaining proficiency. PLAINTIFF GARLAND told him that he believes that US Airways
management was actively working against him and that safety was being compromised for no good
reason. PLAINTIFF GARLAND further recalls that NTSB Inspector Rich Parker and NTSB
Inspector Paul Misenick both said that "If PLAINTIFF GARLAND were involved in an accident
that his flight time record on the B757/767 or lack thereof, would raise considerable concerns and
raise questions, about US Airways reserve pilots maintaining their proficiency.

55.    On or about March 5, 2001, however, after just a short few minutes in the simulator
stopped the 709 ride in progress and summarily deemed the ride unsatisfactory. PLAINTIFF
GARLAND was totally shocked and surprised at his actions. DAVIES had forced the F/O (first
offender) not to help PLAINTIFF GARLAND during the simulator examination. The F/O became
an alter ego of DAVIES denying PLAINTIFF GARLAND a fair and impartial simulator
examination. Each alleged error PLAINTIFF GARLAND committed was induced and created by
F.A.A. Inspector DAVIES. He had specific intent to cause PLAINTIFF GARLAND to fail the
similar examination and did act in concert with US Airways and ALPA to cause PLAINTIFF
GARLAND'S sudden and complete training failure and termination. On or about February 2002,

PLAINTIFF GARLAND recalls that in retaliation, the PHL chief pilots office would allow hundreds of (white) pilots to "step right over him" and climb in the cockpit to fly a trip to maintain their proficiency while at the same time denying PLAINTIFF GARLAND, a black pilot, the same or similar opportunity to keep current.

56.    On April 25, 2001, upon these facts US Airways wrongfully and unjustifiably terminated PLAINTIFF GARLAND.

57.    On December 5, 2001, PLAINTIFF GARLAND filed a motion to reopen civil action no. 86-890 against US Airways.

58.    PLAINTIFF GARLAND recalls also that both NTSB Inspector Parker and Misenick each said "How could the airline allow this type of condition to exist you go long periods of time with no flying, yet remain on-call for a trip on short notice." PLAINTIFF GARLAND urged each of the NTSB investigators to independently investigate and review the matter to their own satisfaction. On or about March 2002, Retired Chief District Court Judge Donald E. Ziegler held a telephone conference where he directed the parties to complete arbitration over PLAINTIFF GARLAND'S objection.

59.    On July 12, 2002, an Arbitration hearing was held pursuant to the Railway Labor Act (RLA) on PLAINTIFF GARLAND'S grievance filed by ALPA against US Airways alleging that US Airways had breached the CBA (Collective Bargaining Agreement) when discharging PLAINTIFF GARLAND under these facts and attendant circumstances.

60.    On or about August 17, 2002, US Airways and ALPA held a grievance hearing before KRINSKY. He ruled in favor of US Airways due to an expectation of tribute and bribe. PLAINTIFF GARLAND seeks another hearing before an unbiased arbitrator or federal court judge as supported by federal case law.

61.    On or about August 11, 2002, US Airways filed for Bankruptcy Court protection. US Airways sought to discharge PLAINTIFF GARLAND'S proof of claim. PLAINTIFF GARLAND seeks to invade the collateral source rule because US Airways admitted in moving papers before the Bankruptcy Court that it had adequate insurance coverage to pay PLAINTIFF GARLAND'S claim in full. Generally, courts have held that the "mere passage of time is not legally conclusive proof against retaliation." Robinson v. SEPTA, 982 F.2d 892, 894 (3d Cir. 1993); see also Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173 (3d Cir.1997); Aman v. Cort Furniture Rental Corp., 85 F.2d 1074, 1085 (3d Cir.1996) and see Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir.1990) ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario."). PLAINTIFF GARLAND has demonstrated that he is entitled to his claim for benefits due under the Disability Plan. Richardson v. New York State Dept. of Correctional Service, 180 F.3d 426, 446 (2nd Cir.1999) ("an employer [can] e held accountable for allowing retaliatory co-worker harassment to occur if it knows about that harassment but fails to act to stop it"); Gunnell v. Utah valley State College, 152 F.3d 1253, 1265 (10th Cir. 1998). PLAINTIFF GARLAND contends that "a continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." Cornwell v. Robinsons, 23 F.3d 694, 704 (2d Cir.1994).

62.    During the course of his tenuous employment, PLAINTIFF GARLAND had become emotionally and physically unable to cope with the daily and routine stresses and tensions associated with unrelenting acts of invidious racial discrimination and retaliation he suffered at the hands of US Airways, et al. Upon legal and medical advice PLAINTIFF GARLAND could no longer effectively serve as an airline captain at US Airways.

63.     In order to induce PLAINTIFF GARLAND'S voluntary resignation, US Airways and the Airline Pilot's Association Intl. (hereinafter ALPA), authorized an adjusted final benefit payment in the form of severance pay that did not address PLAINTIFF GARLAND'S request for disability income retirement benefits under the US Airways Pilots Disability Income Plan on account of the stresses and tensions suffered by PLAINTIFF GARLAND over the course of the previous years due to racial discrimination and retaliation as a black airline captain of US Airways, which symptoms of impairment were well known to the board of directors and other top management officials at US Airways at the time of the termination of PLAINTIFF GARLAND'S employment prior to the termination of the US Airways Pilots Retirement Income Plan.

64.     PLAINTIFF GARLAND has not received any monthly disability income retirement payments before or following receipt of the December 13, 2007 final Benefit Determination letter issued by DEFENDANT PBGC.

65.     Upon information and belief, PLAINTIFF GARLAND alleges that PLAINTIFF GARLAND remains totally and permanently disabled and is entitled to disability retirement income under the US Airways Pilots Disability Income Plan retroactive to July 24, 2001.

66.     The course of action by DEFENDANT PBGC to breach PLAINTIFF GARLAND'S vested rights to full pension benefits in incorrectly determining PLAINTIFF GARLAND'S retirement income and/or in denying disability retirement income to PLAINTIFF GARLAND was wrongful and undertaken in bad faith and contrary to law.

67.     The actions undertaken by DEFENDANT PBGC, wrongfully denying PLAINTIFF GARLAND'S disability income under the US Airways Pilots Disability Income Plan or the correct amount of retirement income under the US Airways Pilots Retirement Income Plan in the manner and for the reasons set forth above were willfully and fraudulently undertaken by DEFENDANT PBGC, and were intended to cause, and have directly and proximately caused damage to PLAINTIFF GARLAND.

68.    All of the benefits due PLAINTIFF GARLAND in accordance with the US Airways Pilots Retirement Income Plan and US Airways Pilots Disability Income Plan were and are vested and nonforfeitable and PLAINTIFF GARLAND has duly complied with all the conditions in order to receive such retirement benefits under each plan.

69.    On or about July 24, 2001, and March 31, 2003, and May 1, 2004, PLAINTIFF GARLAND timely requested payment of all such benefits due him accrued in accordance with the above-mentioned pension Plans.

70.    On or about March 31, 2003, PLAINTIFF GARLAND was notified by DEFENDANT PBGC that all rights and benefits due PLAINTIFF GARLAND under the US Airways Pilots Retirement Income Plan had been substantially reduced. No mention was or has been made about PLAINTIFF GARLAND'S vested rights under the US Airways Pilots Disability Income Plan.

71.    On or about September 27, 2006, PLAINTIFF GARLAND filed a timely request for a review of the decision by DEFENDANT PBGC denying PLAINTIFF GARLAND vested pension benefits in accordance with the US Airways Pilots Retirement Income Plan.

72.    On or about December 13, 2007, PLAINTIFF GARLAND received a decision from the DEFENDANT PBGC denying PLAINTIFF GARLAND full pension rights and benefits due PLAINTIFF GARLAND in accordance with the US Airways Pilots Retirement Income Plan. A copy of the decision is attached, hereto, marked EXHIBIT #7, incorporated by this reference.

73.    DEFENDANT PBGC decision denying PLAINTIFF GARLAND the rights and benefits due PLAINTIFF GARLAND under the US Airways Pilots Retirement Income Plan was arbitrary, illegal, capricious, unreasonable, discriminatory, and not made in good faith and violates Title 26 U.S.C.A. § 401 and all subparagraphs, Title 26 U.S.C.A. § 411 and all subparagraphs, Title 26 U.S.C.A. § 401(a) and all subparagraphs, and Title 26 U.S.C.A. § 501(a) and all subparagraphs.

1  The decision is not supported by substantial evidence and rises from an erroneous application of

2  federal law.

3      74.    On January 14, 2008, PLAINTIFF GARLAND filed with this court a civil complaint

4  and petitioner for judicial review.

5                              **DAMAGES**

6      75.    As a direct and proximate result of such DEFENDANT PBGC'S unlawful and

7  unreasonable actions, as set forth above, PLAINTIFF GARLAND has been forced to incur legal fees

8  and costs to defend against the culpable actions of DEFENDANT PBGC in an amount not known to

9  PLAINTIFF GARLAND, at this time. PLAINTIFF GARLAND has sustained and without

10  immediate relief from this court will continue to accrue compensatory damages in an amount not

11  now known to PLAINTIFF GARLAND, at this time, but on information and belief, such damages

12  will approximate the amount of benefits due PLAINTIFF GARLAND in accordance with the

13  pension and retirement plans for each and every month since July 24, 2001, under the US Airways

14  Pilots Disability Income Plan, and since May 1, 2004 (the first day of the month after age 50 under

15  the US Airways Pilots Retirement Income Plan); PLAINTIFF GARLAND without relief from this

16  court will continue to unreasonably and unnecessarily sustain such same or similar damages each

17  month until the benefits are paid.

18

19

20  **WHEREFORE**, PLAINTIFF PHILIP A. GARLAND requests judgment against PENSION

21  BENEFIT GUARANTY CORPORATION, as follows:

22      a.    Assign this case for hearing at the earliest practical date and cause this case to be

23          in every way expedited;

24

25

26

27

28

b.  A Court Order finding liability against DEFENDANT PBGC and directing the DEFENDANT PENSION BENEFIT GUARANTY CORPORATION to immediately pay to PLAINTIFF PHILIP A. GARLAND all benefits due to PLAINTIFF PHILIP A. GARLAND under the US Airways Pilots Retirement Income Plan and US Airways Pilots Disability Income Plan retroactive to include prejudgment interest to July 24, 2001.

c.  Any and all other such relief this court deems necessary and proper in this case.

DATED this 31st day of JANUARY, 2008.

Philip A. Garland
P.O. Box 33934
Las Vegas, Nevada 89133
(702) 658-5918
Plaintiff
In Pro Se

# ACKNOWLEDGEMENT

STATE OF NEVADA          )
                         ) SS:
COUNTY OF CLARK          )

   On this _3/5ᵗ_ day of JANUARY, 2008, PHILIP A. GARLAND, the undersigned Notary

Public in and for the said County and State, personally appeared and known to me to be the person

described in and who executed the foregoing **AMENDED COMPLAINT**, and who acknowledged

to me that he/she did so freely and voluntarily and for the uses and purposes therein mentioned.

   **WITNESS my hand and official seal.**


                                    _____
                                    NOTARY PUBLIC

                    ARY PUBLIC
                  STATE OF NEVADA
                   County of Clark
                    EDWARD COOK
          No. 07-3930-1
          My Appointment Expires Sept. 15, 2011

20

1

**VERIFICATION**

2  STATE OF NEVADA              )
                                ) SS:
3  COUNTY OF CLARK              )

4      **PHILIP A. GARLAND**, under penalties of perjury, being first duly sworn, deposes and

5  says:

6      That I am the **PLAINTIFF** in the above-entitled action; that I have read the foregoing

7  **AMENDED COMPLAINT** and know the contents thereof; that the same is true of my own

8
   knowledge, except for those matters therein contained stated upon information and believe, and as to

9
   those matters, I believe them to be true.

10
11      **DATED this** 31st **day of JANUARY, 2008.**

12

13                                          _____
                                            PHILIP A. GARLAND

14

15

16

17  SUBSCRIBED and SWORN to before me
    this _3/5ᵗ_ day of JANUARY, 2008.

18

19  _____
    NOTARY PUBLIC
20

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
EDWARD COOK
No: 07-3930-1
My Appointment Expires Sept. 15, 2011

21

22

23

24

25

26

27

28

**EXHIBIT # 1**

6 of 64 DOCUMENTS

**LARRY CURTIS TAYLOR, Plaintiff, v. USAIR, INC., a corporation, and AIR
LINE PILOTS ASSOCIATION, a labor organization, Defendants**

**Civil Action No. 86-1943**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
PENNSYLVANIA**

**1991 U.S. Dist. LEXIS 12386; 56 Fair Empl. Prac. Cas. (BNA) 357; 61 Empl. Prac.
Dec. (CCH) P42,105**

**April 25, 1991, Decided**

**CORE TERMS:** captain, pilot, channel, flight, hired, interviewed, hiring, vice president, multi-engine, interview, hire,
qualification, flying, employment opportunities, disparate impact, influential, resume, nepotistic, word of mouth, pool,
minimum qualifications, hiring practices, preferential, articulated, referral, aircraft, business justification, discriminated,
interviewing, statistics

**JUDGES:** [*1] Donald E. Ziegler, United States District Judge.

**OPINION BY:** ZIEGLER

**OPINION**

FINDINGS OF FACT

1. Plaintiff, Larry Curtis Taylor, is a black male who filed a civil action for money damages, declaratory and injunctive
relief against defendants, USAir, Inc. and the Air Line Pilots Association, based on Title VII of the Civil Rights Act of
1964, 42 U.S.C. § 2000e, *et seq.,* and the Civil Rights Act of 1871, 42 U.S.C. § 1981.

2. Plaintiff Taylor asserts that USAir discriminated against him because of race, in violation of Title VII, 42 U.S.C. §
2000e-2(a)(1) and the 1866 Civil Rights Act, 42 U.S.C. § 1981, when it failed to interview or hire him while interview-
ing and hiring less qualified white applicants for the position of pilot.

3. Jurisdiction is based on 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1343(a).

4. Captain Taylor has satisfied all administrative prerequisites to the filing of this action.

5. Ronald Sessa was the USAir Vice President of Flying who hired all of the pilots in the period 1980-83. William
Leefe served as Captain Sessa's assistant and then as his successor. Captain Sessa testified that USAir hired the best
applicants and had the "pick of the crop" because it was one of the few [*2] airlines hiring pilots in the early 1980s. It
received 6,000 applications annually.

6. The applicant interview was an important step in the employment process and was used by USAir to resolve any
questions concerning the applicant's qualifications and to advise an applicant regarding deficiencies.

7. The 17 black pilots hired in 1981-1984 came through Ms. Formoso and, at a minimum, satisfied the written objective
qualifications published in the USAir Flight Operations Manual.

8. Every pilot who was hired through the alternative hiring channel, which by-passed Ms. Formoso's screening, was
white. Some of the pilots hired through this channel failed to meet the minimum objective written qualifications which
USAir established. In assessing the qualifications of these applicants, the Vice President of Flying used undefined and
reduced standards which were unknown to anyone else. This channel, with its reduced subjective standards, was not
open to qualified black applicants and thus provided white applicants with enhanced employment opportunities.

1991 U.S. Dist. LEXIS 12386, *; 56 Fair Empl. Prac. Cas. (BNA) 357;
61 Empl. Prac. Dec. (CCH) P42,105

9. Captain Sidney Clark, a black pilot, testified that he was told to use the objective qualifications for pilots which were published in the [*3] USAir Flight Operations Manual. He submitted 130-140 applications of black pilots who met, and often exceeded, the USAir minimum qualifications to Ms. Formoso. Only 8 or 9 of the Clark referrals were actually interviewed and only 3 of those interviewed were hired.

10. Captain Clark testified that he submitted the applications of two graduates of the United States Air Force Academy, which Captain Leefe said would be an extremely impressive credential. Neither graduate of the Air Force Academy was interviewed.

11. Captain Clark testified that he was having such a lack of success in getting qualified black applicants interviewed that he concluded that his submission of an application was detrimental. He testified that he referred one applicant and told him not to say that he knew Captain Clark. When that applicant said at his interview that he did not know Captain Clark, he was hired.

12. Captain Clark was a credible witness who testified without any apparent bias to either party.

13. Larry Curtis Taylor began to apply for a position as a pilot with USAir in 1978. In March 1981, Captain Taylor submitted a resume with a photograph which showed that he was a black male. He submitted updated [*4] resumes in November 1981 and October 1982. He submitted an application in January 1983 and updated resumes in September 1983 and November 1984. USAir accepted resumes just as it accepted applications.

14. As of March 1981, Captain Taylor had submitted a resume and flight time supplement showing 3076 total hours, 810 of which were multi-engine and/or heavy aircraft, a class I FAA physical certificate without waivers, a high school diploma and had attended junior college with general courses of study. Captain Taylor met USAir's minimum qualifications which were published in its Flight Operations Manual.

15. Despite meeting these minimum qualifications in 1981, Captain Taylor was never called for an interview by USAir. During the years his application lay dormant, USAir continued to interview white applicants, many of whom were less qualified than him. The court finds that USAir hired a number of white relative and influential referral applicants, as well as less or equally qualified white applicants while Captain Taylor waited to be considered.

16. Dr. James Kenkel, a professor in the Economics Department at the University of Pittsburgh, performed a statistical analysis of 91 individuals [*5] who had applied for pilot positions at USAir during the period in question and whose files have been supplied to counsel. The purpose of this study was to conduct an analysis of the contention of USAir that it hired the best qualified pilots without regard to race. The study was not intended, and did not purport, to be a statistical analysis of a random sample of the populations of black versus white pilot applicants. The stated goal was to determine what differences in treatment if any; were based on race or other criteria. The report used statistics to test various hypotheses concerning the hiring practices of USAir based on an examination of the objective date. The objective criteria analyzed by the report was derived from USAir: the data on the individuals analyzed was present in the personnel files of these individuals maintained by USAir; the objective criteria against which the sample was measured was based on USAir's published Flight Operations Manual and the deposition testimony of Donna Formoso concerning the rank order of preferred flight experience employed in her screening process as the recruitment coordinator. The results of the study were contained in a summary report [*6] and a statistical report which were filed with Captain Taylor's Pretrial Narrative Statement.

17. Professor Kenkel reached the conclusion that, based on objective criteria which he used, Captain Taylor should have been interviewed because he was better qualified than all of the pre-1982 applicants except for Philip Garland.

18. Professor Kenkel also concluded, and this court finds that:

A. Defendant USAir did not hire the best applicants. Captain Taylor was a better qualified pilot than many of the applicants who were hired.

B. Based on objective criteria, Captain Taylor ranked among the best eight applicants in the sample of 91 applicants.

**C. Captain Taylor was better qualified than the typical white applicant in his sample.**

D. Captain Taylor was better qualified than the typical applicant who had a relative at USAir.

E. Captain Taylor was better qualified than the typical applicant who had an influential non-relative referral; and

1991 U.S. Dist. LEXIS 12386, *; 56 Fair Empl. Prac. Cas. (BNA) 357;
61 Empl. Prac. Dec. (CCH) P42,105

F. Captain Taylor was better qualified than the typical applicant who was deficient in some way based on USAir's published hiring standards.

19. Professor Kenkel opined, and this court finds that, based on his study of objective criteria, Captain Taylor [*7] was discriminated against on the basis of his race.

20. Professor Kenkel concluded and we find that USAir did not hire the best qualified pilot applicants. Dr. Kenkel concluded, and this court finds, that Captain Taylor was not interviewed and was not hired because of his race.

21. Captain Taylor, due to his race, was denied a significant employment opportunity by USAir by not being interviewed.

22. Each time a white applicant was interviewed or hired through the nepotistic/word of mouth channel, Captain Taylor was subjected to another instance of discrimination.

23. The court also finds that the disparate treatment to which Captain Taylor was subjected amounted to intentional discrimination on account of Captain Taylor's race. The evidence relied upon by the court in finding intentional discrimination is as follows:

A. USAir followed two separate standards for hiring pilots. One standard was the written qualifications stated in the Flight Operations Manual which Ms. Formoso and Captain Clark followed in selecting applicants for Captains Sessa and Leefe to interview. That standard applied to all black applicants. The second standard was one which was relaxed when applied to select [*8] white pilots such as Robert Burdick, Robert Knapp, Charles Buttion and William Lacey. These pilots were interviewed, and at least three were hired, when they failed to meet the minimum written standards for flying experience and/or education. No black applicant had the minimum standards "relaxed" as was done for these white pilots;

B. Captain Clark's testimony proved that he took the applications of more than 100 qualified black pilots to Ms. Formoso, only eight or nine of whom were interviewed and only three of whom were actually hired. Since the court finds Captain Clark to have been an extremely credible witness, USAir's conduct showed an intentional disregard for the great number of qualified black applicants in the interviewing and hiring process;

C. USAir asserted in its Pretrial Statement and at trial that Captain Clark was its black pilot recruiter and that black pilot applicants were hired through him. "Thus, black pilots actually had two channels available to them: the normal channel for friends and relatives of USAir employees and the 'Sidney Clark' channel designed specifically for black applicants." (Defendant's Pretrial Statement at pages 5-6) This assertion is false [*9] and was rebutted by Captain Clark who termed the "Sidney Clark" channel the "kiss of death;"

D. Captain Sessa's testimony that, pursuant to USAir's affirmative action plan, he sought but could not find many qualified black pilot applicants despite his best efforts is not persuasive in light of the special treatment of white pilots such as Burdick, Buttion, Knapp and Lacey and in light of Captain Clark's testimony that he hand-delivered more than 100 applications of qualified black pilots who were never interviewed;

E. The record supports a finding that USAir failed to use its best efforts to find and hire qualified black applicants, and that USAir intentionally failed to interview and hire qualified black applicants such as Captain Taylor and the many applicants whose applications Captain Clark hand delivered to Ms. Formoso;

F. USAir maintained a separate hiring channel for the exclusive benefit of white pilot applicants with relatives at USAir or referrals from influential non-relatives. The opportunities presented by access to the alternative or "Vice President's" channel were more favorable than those through the normal channel. The former channel was available to white pilots [*10] only. USAir's practice of hiring white pilots through this channel intentionally discriminated against qualified black applicants;

G. USAir should have anticipated a virtually all white applicant pool during the LPP period and certainly should have known upon the conclusion of the LPP of this result; yet it continued its practice of preferential treatment through the "Vice President's" channel. This preferential practice was established for whites, despite USAir's knowledge of the insufficient number of black hires, and the presence of a black applicant pool which, according to the credible testimony of Captain Clark, contained 50 or 60 qualified and available black applicants during the pertinent period. Continuation of these practices, with knowledge of a short fall in black hires, resulted in an overall decline in the number of black pilot applicants interviewed and hired after the LPP, such that in the period from December 14, 1984 through February 3, 1986 when only 1 of 192 pilots hired was black; and

H. While USAir hired two minority pilots (Carol Lopez a female and Manuel Lopez a Hispanic) as exceptions to its LLP rule, it failed to make any similar exception for blacks.

24. [*11] USAir has asserted two reasons for not interviewing or hiring Captain Taylor: he had an insufficient number of college credits, and his multi-engine time was too low. We will discuss each of these reasons separately.

25. Captain Sessa confirmed that Ms. Formoso kept a file of black pilot applicants, which file she gave to him periodically, and that Captain Taylor's application was among the applications contained in this file. He testified further that Captain Taylor was not interviewed in 1981 because he did not have 60 college credits. Captain Sessa testified that, although the written USAir Flight Operations Manual qualifications, which he wrote, stated in the April 1981 insert that some college was preferred, he did not consider any applicant who had fewer than 60 college credits.

26. Defendant's evidence with regard to Captain Taylor is not persuasive and is found to be pretextual because:

A. Captain Taylor met the minimum written educational requirements in March 1981.

B. Although Captain Taylor had 20 college credits in 1981, he stated on his resumes only that he had completed general courses of study in a junior college. The 20 college credits were first made known to USAir [*12] on his application of January 1983. Thus, USAir could not have known, prior to January, 1983, that Captain Taylor had fewer than 60 college credits;

**C. Although Captain Sessa maintained that he did not have the time to inform Captain Taylor about the alleged college credit deficiency, the same was not true for white applicants. On July 9, 1982 William Lacey, who had met Captain Sessa at an air show, submitted his application. Captain Sessa wrote to him that he was surprised that he had no college credits. Captain Sessa asked Mr. Lacey in his letter "How do you feel about going back to school?"**

D. On August 16, 1983 Captain Sessa interviewed Mr. Lacey, and on September 7, 1983 he was hired as a pilot at USAir; by letter dated September 8, 1983, Embry-Riddle Aeronautical University stated that Mr. Lacey had applied for acceptance as a student and that it had unofficially given him 48 credits. We find that defendant encouraged Mr. Lacey to get college credits, and Captain Sessa interviewed and hired Mr. Lacey when he did not have 60 college credits;

E. Captain Taylor testified that he was not aware that he was considered to be deficient in college credits because he did not see the standards [*13] in the USAir Flight Operations Manual, and no one from USAir told him of this deficiency. He testified and we find that had he been informed of this alleged deficiency, as were some white applicants, he would have obtained sufficient college credits.

27. USAir asserts, as a non-discriminatory reason, that Plaintiff Taylor did not have the required number of hours of flying experience on a multi-engine aircraft. This court is persuaded by the following facts that USAir's reliance on Captain Taylor's multi-engine experience, as a basis for denying him an interview and employment, was pretextual:

A. Up until December 1981, USAir's minimum flight requirement was 1200 hours with a large percentage attributable to a multi-engine aircraft. Thus, Captain Taylor's qualifications should have been initially assessed against those standards.

B. As of the time he submitted his March, 1981 flight time supplement, Captain Taylor met USAir's minimum published flight time requirement. He had 3,076 total hours, 810 of which were multi-engine.

C. USAir claims there was some confusion as to the number of multi-engine hours appearing on the flight time supplement. Captain Sessa, who would have reviewed [*14] Captain Taylor's submissions as part of his routine review of all black applicant information, examined Captain Taylor's flight time supplement at trial and ascertained the correct number of multi-engine hours. To the extent there was confusion in the past, the court finds that this would have been resolved had Captain Taylor been granted an interview, as was provided to certain white applicants who were thought to have some deficiency.

D. By the time Captain Taylor submitted his formal employment application in 1983, he satisfied the heightened flight time requirement of 2,000 total hours with 1,000 multi-engine/heavy aircraft hours. USAir offers no reason with respect to multi-engine flight time for withholding an interview from Captain Taylor after receiving the January 1983 resume and subsequent qualification updates.

1991 U.S. Dist. LEXIS 12386, *; 56 Fair Empl. Prac. Cas. (BNA) 357;
61 Empl. Prac. Dec. (CCH) P42,105

E. USAir continued to interview and/or hire whites who had fewer multi-engine hours than required by the objective written standards:

(1) In 1982 Captain Sessa interviewed and hired Robert Knapp, a white advertising banner pilot, when he had 1,435 total hours of which 315 were multi-engine when the written USAir Flight Operations Manual required a minimum of 2,000 [*15] total hours, 1,000 of which must have been multi-engine and/or heavy aircraft;

(2) In May 1981 Captain Sessa interviewed Robert Burdick, a white pilot with no commercial experience, who had only 32 multi-engine hours; and

(3) In September 1983 Captain Sessa interviewed Charles Buttion, a white pilot, who had only 1,300 total hours, 600 of which were multi-engine, and in September 1984 Mr. Buttion was hired while he still did not possess the minimum 2,000 total hours and 1,000 multi-engine hours.

28. The basis given by USAir for not interviewing Captain Taylor did not constitute legitimate business reasons and were a pretext for not interviewing and hiring him because of his race.

29. The evidence demonstrates the existence of a specific hiring practice maintained by USAir to this date which has been operated for the benefit of white applicants, particularly those with relatives at USAir or who were referred to the Vice Presidents of Flying by influential persons.

30. These white applicants were routed through a "back door" directly to the Vice Presidents of Flying, or "Vice President's channel," and as a result were the beneficiaries of a relaxation of the stated objective minimum [*16] qualifications of the Flight Operations Manual. Applicants through the "Vice President's Channel" were interviewed and in some cases hired with less than the minimum stated objective qualifications.

31. Captain Sessa testified that he could "bend the rules" for those who came highly recommended by allowing the interview and even hire an applicant with qualifications below the stated written minimum qualifications. This preferential treatment was accorded to white applicants alone.

32. No black applicants were interviewed or hired through the "Vice President's Channel." Each black hired by USAir was interviewed and hired only after they passed the screening process of the recruitment coordinator who determined that they met or exceeded objective minimum qualifications.

33. Being interviewed via the alternative "Vice President's Channel" was an important factor in being favorably considered for hire as a pilot for USAir.

34. Despite efforts of Defendant USAir to characterize a separate but equal path for blacks, denominated in its Pretrial Statement as the "Sidney Clark Channel," the testimony of Sidney Clark, a credible witness, was that no such channel existed. Applications received [*17] from Captain Clark were forwarded to the recruitment coordinator for her ordinary screening process. Captain Clark testified that he had no direct access to the Vice Presidents.

35. Defendant's effort at trial to characterize the "Vice President's Channel" as a "single back door" equally available to blacks and whites was discredited by the testimony. The evidence revealed the sole preferential means for access to the Vice President being one available to white pilot applicants exclusively. Captain Clark's testimony confirmed that USAir had a hiring practice which had a disparate impact against qualified and available black applicants since the sole beneficiaries of the procedures and standards of the alternative, "Vice President's Channel," were white.

36. The significance of this separate employment practice to USAir is demonstrated by defendant's application which on its face asks "Do you have any relatives employed by USAir?", and by its interview summary sheet which on its face requests the name of the individual the applicant was "Referred by," and is manifested by the deference accorded the minimally qualified applicants processed through this channel and by the promulgation [*18] of a set aside or quota of one vacancy for pilot applicants through this channel in every other hiring class.

37. USAir failed to prove any business justification for the maintenance of the discriminatory alternative channel. Captains Sessa and Leefe testified that they were inundated with qualified pilot applicants so that they could pick the "cream of the crop." Similarly, each captain testified that there was a dearth of qualified black applicants. No business justification is present in the maintenance of an all white recruitment and hiring channel when there was an ample availability of qualified whites and an asserted dearth of qualified black applicants. USAir's efforts to justify the maintenance of the "Vice President's Channel" by contending that a separate but equal channel was available to blacks through Captain Clark is not supported by the testimony. Captain Clark testified that he did not have direct access to the Vice Presi-

1991 U.S. Dist. LEXIS 12386, *; 56 Fair Empl. Prac. Cas. (BNA) 357;
61 Empl. Prac. Dec. (CCH) P42,105

dent of Flying. He was required to place black applications in the pool from which Ms. Formoso screened applications for transmittal to the vice president.

CONCLUSIONS OF LAW

1. Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer:

[*19] To fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race [or] color. . . .

42 U.S.C. § 2000e-2 (a)(1). Not only does Title VII prohibit the failure to hire an individual on account of race or color, it provides additional protection in that it is unlawful for an employer:

To limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities . . . .

42 U.S.C. § 2000e-2 (a)(2).

2. Larry Taylor's claim that USAir failed to hire or provide him with employment opportunities equal to those given preferred white applicants is also actionable under 42 U.S.C. § 1981 which guarantees black citizens the same right "to make and enforce contracts . . . as is enjoyed by white citizens." The legal standards for establishing a right to relief under a § 1981 claim arising out of the deprivation of equal employment opportunities and a failure to hire are the same as those which have been recognized for proving a Title VII case. *Patterson* [*20] *v. McLean Credit union*, U.S. , 109 S.Ct. 2363, 2377-2378 (1989).

3 Plaintiff Taylor has proffered two theories of a discriminatory failure to interview and hire which are supported by a preponderance of the evidence: disparate treatment and disparate impact. Initially, we find that plaintiff has proven by a preponderance of the evidence that he was the victim of disparate treatment on account of his race. That is, USAir continued to interview and hire lesser or equally qualified whites while taking no action on his own application. Secondly, the evidence further preponderates, and the court concludes, that Captain Taylor was the victim of a specific hiring procedure having an adverse disparate impact on blacks. The specific policy challenged by Captain Taylor was USAir's operation of a Vice President's hiring channel, unsupported by any legitimate business justification, which granted special preference to white applicants with either relatives employed by USAir or with influential references.

4. Where, as here, higher unwritten subjective hiring criteria are used in evaluating black applicants and the use of non-job related criteria, such as whether an applicant [*21] is related to another employee or whether an applicant is supported by an influential individual, an adverse impact occurs on the employment opportunities of minority applicants and employment discrimination is present. *Connecticut v. Teal,* 457 U.S. 440 (1982). As the Supreme Court held in *Teal,* 102 S.Ct. at 2533 Title VII guarantees blacks the "opportunity to compete equally with white workers on the basis of job related criteria."

5. According to the evidence presented to the court, USAir interviewed and hired lesser qualified pilots than Captain Taylor. Examples of differential treatment on account of race are that 17 white flight officers with relatives employed at USAir and 39 white flight officers whose employment aspirations were supported by non-relative influential referrals who were interviewed and hired during the pertinent time period. Special preference was given to these white nepotistic and word of mouth hires, some of whom did not meet USAir's written objective minimum hiring standards. No black applicant was accorded the preferred treatment and consideration given to this pool of white applicants.

6. In *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 1094 (1981), [*22] the Court, commenting on the *McDonald Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817 (1973), noted that a plaintiff initially need only prove that he applied for a position for which he was qualified "but was rejected under circumstances giving rise to an inference of unlawful discrimination." Plaintiff Taylor satisfied his initial burden of proving a prima facie case of disparate treatment race discrimination in that:

A. He presented convincing evidence that he met all objective minimum qualifications set forth in USAir's Flight Operations Manual when he submitted his employment application in April, 1981. Captain Taylor was never granted an interview even though USAir maintained it was interested in hiring all qualified black applicants;

1991 U.S. Dist. LEXIS 12386, *; 56 Fair Empl. Prac. Cas. (BNA) 357;
61 Empl. Prac. Dec. (CCH) P42,105

B. During the time that Captain Taylor's application lay dormant in USAir's black applicant file, USAir continued to interview and/or hire white applicants, many of whom were not as objectively qualified as Captain Taylor. Some of these less qualified whites were interviewed either as the result of a relative at USAir or other influential sponsor.

C. The applicant interview was an extremely important screening step [*23] in the hiring process and was used to provide unqualified favored white applicants with information as to how their qualifications could be improved. No such information was provided to black applicants.

7. USAir attempted to counter Captain Taylor's prima facie case by denying that it treated Captain Taylor less favorably than whites who had applied during the same time period. Given the undisputed evidence that specific white applicants were given preferential treatment, the statements of two Vice Presidents of Flying that "exceptions" were made so as to allow the interview and/or employment of certain whites who did not meet minimum standards, the undisputed testimony that the Vice-Presidents of Flying would advise unqualified white applicants how to improve their qualifications so as to satisfy minimum hiring criteria, as well as the differences between USAir's description of the Sidney Clark channel through which it maintains blacks were recruited and the contrary testimony of Sidney Clark, who this court finds to be both neutral and entirely believable, the court concludes that USAir's denial lacks credibility.

8. As a consequence of Captain Taylor satisfying his burden of establishing [*24] a prima facie case, the burden shifted to USAir to articulate a legitimate, non-discriminatory reason for its failure to interview and/or hire Captain Taylor. *Burdine,* 101 S.Ct. at 1093. Reasons first articulated after initiation of the lawsuit are suspect and considered by the court to be self serving. *Healy vs New York Life Insurance Co.,* 860 F.2d 1209, 1215 (3d Cir. 1988).

9. The non-discriminatory reasons which have been articulated by USAir for not hiring Captain Taylor have changed over time and must therefore be carefully scrutinized. USAir has articulated two non-discriminatory reasons for not hiring Captain Taylor: a. his multi-engine flight experience was insufficient; and b. he had insufficient college education. As is now explained, this court concludes that the reasons articulated by USAir either lack credibility or are pretextual:

10. USAir maintains that Captain Taylor lacked the requisite number of hours flying a multi-engine experience and that Captain Taylor fell below this standard. In this regard, USAir maintains that Captain Taylor prepared his flight summary in such a way that it appeared as if he had under [*25] 400 hours of multi-engine time. The court finds USAir's reasoning to be both pretextual and unpersuasive.

11. USAir's minimum hiring criteria are set forth in the Flight Operations Manual. Captain Taylor first submitted his resume to USAir in 1978 and updates were regularly mailed. USAir's April, 1981 Flight Operations Manual reveals that pilots must have a minimum of 1200 hours total flight time with a large percentage multi-engine and/or heavy aircraft time. Thus, Captain Taylor's March, 1981 flight supplement, which indicated approximately 800 multi-engine hours, must be judged by the standards appearing in the Flight Operations Manual, not those articulated at trial by USAir. Furthermore, Captain Sessa, USAir's former Vice President of Flying, examined Captain Taylor's flight supplement at trial and was able to ascertain Captain Taylor's true number of multi-engine hours. In fact, he testified that Captain Taylor's multi-engine hours were satisfactory. Finally, USAir has articulated no reason concerning flight time for not acting upon his application in 1983 when Captain Taylor satisfied the enhanced multi-engine hours requirement with an excess of 1000 hours.

12. USAir maintained [*26] at trial that Captain Taylor was ineligible for employment because he had not completed two years of college or earned 60 college credits. The court concludes that Plaintiff Taylor established the pretextual nature of USAir's assertions. According to the April, 1981 Flight Operation Manual, pilots were only required to have a high school diploma. Captain Taylor's resume indicates that he was a high school graduate with some college experience. The two year/60 college credit first appeared in the December, 1981 Flight Operations Manual insert. Although USAir claimed at trial that Captain Taylor was not interviewed due to his failure to satisfy the college requirement, it did not learn that Captain Taylor had less than 60 college credits until receiving Mr. Taylor's 1983 application. Furthermore, USAir interviewed white applicants with less than the required college background and, where necessary, advised white applicants how to improve their educational qualifications. No such opportunity was given Captain Taylor or other black applicants. Rather, USAir's Vice President of Flying said he had no time to notify Captain Taylor that he needed additional college credits. As the court has [*27] already found, if USAir had notified Captain Taylor that he needed additional college credits, Captain Taylor would have obtained the credits from an aeronautical college with previously accumulated flight time.

1991 U.S. Dist. LEXIS 12386, *; 56 Fair Empl. Prac. Cas. (BNA) 357;
61 Empl. Prac. Dec. (CCH) P42,105

13. Captain Taylor has met his burden of proving, by a preponderance of the evidence, that USAir deprived him of employment opportunities available to white applicants, *Teal, supra,* and that he was treated less favorably than equally or less qualified whites on account of his race. *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 1482 (1983). He therefore met his ultimate burden of proving that USAir intentionally discriminated against him. *Burdine,* 101 S.Ct. at 1093. In concluding that there was intentional discrimination, the court relies upon the following matters each of which, standing alone, is sufficient to establish the requisite intent in the context of this case: USAir's willingness to interview white applicants with questionable qualifications and advise them to improve their chances of employment while maintaining that there was no time to give black applicants [*28] similar consideration; USAir's after the fact use of enhanced and hiring criteria, not then in effect, to explain its failure to consider Captain Taylor; USAir's operation of a distinct nepotistic/word of mouth hiring channel which benefitted whites only, *EEOC vs. Metal Service Company,* 892 F.2d 341, 350 (3d Cir. 1990); *Gibson vs. ILWU. Local 40,* 543 F.2d 1259 (9th Cir. 1976); USAir's use of a hiring practice which gives preferential treatment to whites and has a disparate impact on black applicants, *Green vs. USX Corp.,* 896 F.2d 801, 807 (3d cir. 1990); the EEOC determination of reasonable cause, *Smith v. American Service Company,* 611 F.Supp. 321, 329 (D.C.Ga. 1984) and the failure of USAir to make reasonable efforts to follow through with its stated goal of actively recruiting qualified black pilots. Defendant's assertion that it was not receiving applications from qualified blacks when the evidence shows that Captain Clark submitted 130-140 applications on behalf of qualified black applicants; its pursuit of practices which deprived blacks of employment opportunities available to whites, *see, Gonzales vs. Police Department of San Jose,* 901 F.2d 758, 761 (1990); [*29] as well as this courts' assessment of the USAir's credibility concerning the existence and operation of a Sidney Clark Vice President's channel.

14. Captain Taylor has also met his burden of proving, by a preponderance of the evidence, discrimination under a theory of disparate impact. Under this analysis, Captain Taylor must identify a specific hiring practice that "has a significantly disparate impact on employment opportunities for whites and nonwhites." *Wards Cove Packing Co., Inc. vs. Atonio,* 109 S.Ct. 2115, 2125 (1989). In the instant case, the challenged practice is USAir's operation of a separate hiring channel which is available exclusively to favored white applicants. Pursuant to *Wards Cove,* 109 S.Ct. at 2121, 2124 n. 9, this court has compared the racial composition of the "at issue" jobs (those filled through the Vice-President's channel), which is all white, to the qualified applicant pool. Given the available qualified black applicant pool as testified to by Captain Clark, this court concludes that USAir's maintenance of an all white nepotistic/word of mouth hiring channel had a disparate impact on blacks. *See, NAACP v. Town of Harrison,* 749 F.Supp. 1327, 1337 (D.N.J. 1990). [*30]

15. By way of a defense to a disparate impact claim, USAir may offer evidence of a business justification for the challenged practice. USAir has offered no evidence to justify operation of a Vice President's channel which enhanced the employment opportunities of white nepotistic/influential word of mouth applicants. Given USAir's testimony that it had fallen short on its minority recruitment goal and was therefore interested in hiring all qualified black applicants, the court can find no legitimate justification for the maintenance of employment practices such as the Vice President's channel, nepotistic/word of mouth channel, application entries concerning relatives and interview summary entries concerning referrals, each of which have resulted in the hire of whites only. The court further finds that USAir's "set aside" for nepotistic applicants of one space in every other hiring class had the effect of perpetuating USAir's discriminatory practices and displacing qualified black applicants, such as Captain Taylor.

16. Rather than offering evidence as to the business justification for its practices, USAir attempted to show that its percentage of black pilots exceeded that which would [*31] have been indicated if the appropriate labor market were defined by census statistics. The use of statistics based upon census data by USAir is dubious where, as here, there was an easily identified qualified pool of actual black applicants. Even if accurate, the court rejects the use of USAir's bottom line statistics to rebut Captain Taylor's case because such statistics are irrelevant to the determination of whether an individual was discriminated against or whether the particular challenged practice had a disparate impact on Captain Taylor or blacks as a group. *Wards Cove,* 109 S.Ct. at 2123 n. 8; *Connecticut v. Teal,* 457 U.S. 440, 102 S.Ct. 2525 (1982).

17. The court concludes that Captain Taylor was subjected to prohibited employment discrimination as early as 1978. Since his application remained on file with USAir and was regularly updated by him, the employment discrimination amounted to a continuing violation which did not cease until Captain Taylor became employed with USAir through defendant's merger with PSA in 1988. The court also concludes that Captain Taylor had no notice of this continuing violation until shortly before [*32] filing his EEOC charge in December, 1984.

15. The court is constrained, however, from awarding relief under Title VII which goes back more than two years from the date of the filing of a charge of discrimination with the EEOC. *Albemarle Paper Co. vs. Moody,* 422 U.S. 405, 95 S.Ct. 2362 (1975). The court therefore finds that Captain Taylor, who should have been interviewed and hired in 1981,

1991 U.S. Dist. LEXIS 12386, *; 56 Fair Empl. Prac. Cas. (BNA) 357;
61 Empl. Prac. Dec. (CCH) P42,105

is entitled to full back wages, benefits and seniority rights retroactive to December 11, 1982. *International Brotherhood of Teamsters vs. U.S.,* 431 U.S. 324, 97 S.Ct. 1843 (1977). Pursuant to his § 1981 claim, Captain Taylor is entitled to compensatory damages for the pain and suffering occasioned by USAir's deprivation of his right "to make and enforce contracts . . . [on the same basis] as is enjoyed by white citizens." Plaintiff is also entitled to a declaratory judgment with respect to the discrimination to which he has been subjected. Injunctive relief, enjoining USAir from pursuing its discriminatory hiring practices, including an all white Vice President's channel, and an all white nepotistic/word of mouth channel, shall also [*33] be issued.

16. At the reconvened hearing, this court shall hear evidence and argument so as to make specific determinations on the amount of damages to be awarded, including back wages as of December 14, 1982 and full compensatory damages under 42 U.S.C. § 1981, the form of declaratory and injunctive relief to be entered and whether other relief would be appropriate to award in this case.

7 of 64 DOCUMENTS

**PHILIP A. GARLAND, Plaintiff, v. USAIR, INC., et al., Defendants**

**Civil Action No. 86-890**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**767 F. Supp. 715; 1991 U.S. Dist. LEXIS 9825; 56 Fair Empl. Prac. Cas. (BNA) 366; 61 Empl. Prac. Dec. (CCH) P42,106**

**April 25, 1991, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, a black male pilot, filed a civil action for money damages, declaratory and injunctive relief against defendants, airline and pilots' association, based on Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. §§ 2000e, et seq., and the Civil Rights Act of 1866, 42 U.S.C.S. § 1981, contending that the airline failed to hire him and, instead, hired less qualified white applicants.

**OVERVIEW:** A pilot applied for employment with an airline but was not hired for a period of three years despite being more qualified than white applicants who were hired. The pilot alleged that the airline had more than 130 applications of black pilots who met the minimum requirements but only three were hired, whereas white pilots who failed to meet the requirements were hired if they were related to someone at the airline or were recommended by someone influential. The court found that the pilot was treated less favorably than equally qualified whites on account of his race and had met his ultimate burden of proving that the airline intentionally discriminated against him. The court found that the airline had a distinct nepotistic/word of mouth hiring channel which benefitted whites only; that it failed to uniformly follow the published objective hiring criteria; and that it failed to make reasonable efforts to follow through with its stated goal of actively recruiting qualified black pilots. The court ordered relief for the pilot under both Title VII and 42 U.S.C.S. § 1981.

**OUTCOME:** The court found that the airline subjected the pilot to prohibited employment discrimination and it awarded the pilot full back wages, benefits, retroactive seniority rights, compensatory damages for public humiliation, declaratory relief, and injunctive relief.

**CORE TERMS:** captain, pilot, channel, hired, hiring, hire, interview, vice president, flight, interviewed, airline, influential, flying, qualifications, multi-engine, referral, disparate impact, aircraft, pretextual, screening, credible, hiring practice, word of mouth, nepotistic, subjected, minimum qualifications, non-relative, recruitment, rating, heavy

**LexisNexis(R) Headnotes**

*Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964*
*Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions*
[HN1] Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race or color. 42 U.S.C.S. § 2000e-2(a)(1). Not only does Title VII prohibit the failure to hire an individual on account of race or color, it provides additional protection in that it is unlawful for an employer to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities. 42 U.S.C.S. § 2000e-2(a)(2).

Case 1:08-cv-00151-RCL    Document 3-2    Filed 02/04/2008    Page 12 of 28

Page 21
767 F. Supp. 715, *; 1991 U.S. Dist. LEXIS 9825, **;
56 Fair Empl. Prac. Cas. (BNA) 366; 61 Empl. Prac. Dec. (CCH) P42,106

*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Proof of Discrimination*
*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Protected Parties*
*Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions*
[HN2] Title 42 U.S.C.S. § 1981 guarantees black citizens the same right to make and enforce contracts as is enjoyed by white citizens. The legal standards for establishing a right to relief under a § 1981 failure to hire claim are the same as those which have been adopted for proving a Title VII case.

*Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964*
*Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions*
[HN3] Where the use of non-job related criteria, such as whether an applicant is related to another employee, or whether an applicant is supported by an influential individual, has an adverse impact on the employment opportunities of minority applicants, employment discrimination is present.

*Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964*
*Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions*
[HN4] A plaintiff, to make a prima facie case, need only prove that he applied for a position for which he was qualified but was rejected under circumstances which give rise to an inference of unlawful discrimination.

*Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964*
*Labor & Employment Law > Discrimination > Racial Discrimination > Defenses & Exceptions > General Overview*
[HN5] As a consequence of a plaintiff employee satisfying his burden of establishing a prima facie case of employment discrimination, the burden shifts to a defendant employer to articulate a legitimate, non-discriminatory reason for its failure to hire the plaintiff employee. Reasons which are first articulated after initiation of the lawsuit are suspect and considered by the court to be self serving.

*Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964*
*Labor & Employment Law > Discrimination > Disparate Impact > Employment Practices > Selection Procedures > Neutral Factors*
*Labor & Employment Law > Discrimination > Disparate Impact > Proof > Burdens of Proof*
[HN6] Under a theory of disparate impact, a plaintiff applicant alleging discrimination must identify a specific hiring practice that has a significantly disparate impact on employment opportunities for whites and nonwhites.

*Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964*
*Labor & Employment Law > Discrimination > Disparate Impact > Defenses & Exceptions > Balanced Workforce & Bottom Line*
*Labor & Employment Law > Discrimination > Disparate Impact > Proof > Statistical Evidence*
[HN7] Labor market statistics are irrelevant to the determination of whether an individual was discriminated against or whether the particular challenged practice has a disparate impact on a plaintiff applicant or blacks as a group.

*Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Statutes of Limitations > Continuing Violations*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > Continuing Violations*
[HN8] The court is constrained from awarding relief under Title VII which goes back more than two years from the date of filing of a charge of discrimination with the Equal Employment Opportunity Commission.

**COUNSEL:** [**1]  Michael L. Rosenfield, Esq. (Philip Garland), Jon Pushinsky, Esq. (Philip Garland), Martin M. Horowitz, Esq. (Philip Garland), for Plaintiff.

Sidney Zonn, Esq. (USAir), Susand S. Sauntry, Esq. (USAir).

Larry A. Silverman, Esq. (Airline Pilots Assn), Michael E. Abrams, Esq. (Airline Pilots Assn), for Defendants.

767 F. Supp. 715, *; 1991 U.S. Dist. LEXIS 9825, **;
56 Fair Empl. Prac. Cas. (BNA) 366; 61 Empl. Prac. Dec. (CCH) P42,106

**JUDGES:** Donald E. Ziegler, United States District Judge.

**OPINION BY:** ZIEGLER

**OPINION**

[*716] FINDINGS OF FACT

DONALD E. ZIEGLER, UNITED STATES DISTRICT JUDGE

1. Plaintiff, Philip A. Garland, is a black male who filed a civil action for money damages, declaratory and injunctive relief against defendants, USAir, Inc., and the Air Line Pilots Association, based on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981.

2. Plaintiff Garland contends that USAir violated Title VII, 42 U.S.C. § 2000e-2(a)(1), and 42 U.S.C. § 1981, by failing to hire him and hiring less qualified white applicants for the position of pilot. Mr. Garland also claims that he was harassed [*717] and suffered retaliation in violation of Title VII.

3. Jurisdiction is based on 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1343(a).

4. Plaintiff Garland has satisfied all administrative prerequisites to the filing of this action, [**2] including filing written charges with the Equal Employment Opportunity Commission; investigation by the agency; a finding of reasonable cause to believe that USAir violated Title VII by failing to hire because of race; receipt of a notice of the right to sue; and the timely filing of a complaint.

5. Defendant USAir, Inc., published objective criteria for hiring pilots in a Flight Operations Manual. In the April 24, 1981 insert to the Manual, USAir stated that pilot hires should have, *inter alia*, approximately 1,200 total hours of flying experience with a large percentage of multi-engine and /or heavy aircraft experience, and a high school diploma with college background preferred. The insert of December 25, 1981, called for approximately 2,000 hours of total flying experience with a large percentage of multi-engine and/or heavy aircraft experience, a high school diploma and a minimum of two years of college. The insert of March 2, 1984 contained the same requirements as the December 25, 1981 insert.

6. From 1981 until 1987, Donna Formoso was the pilot recruitment coordinator who worked for the Vice Presidents of Flying, Ronald Sessa (1980-1983) and William Leefe (1983-1988). Miss [**3] Formoso screened the applications that USAir received and selected those applicants who met objective qualifications. She then transmitted the file to Captains Sessa and/or Leefe for their consideration for interview. She learned the required qualifications from discussions with Captains Sessa and Leefe and through her experience on the job. Captain Sessa or Captain Leefe only received applications that met the minimum qualifications. Ms. Formoso testified that she kept a separate file that contained the applications of black pilots. This file contained approximately ten applications at any time.

7. Although all applications were to be processed by Ms. Formoso, an alternative hiring channel existed wherein relatives, friends and applicants sponsored by influential persons were referred directly to Captains Sessa or Leefe. These applications by-passed screening for minimum qualifications by Ms. Formoso. Captain Sessa or Leefe then reviewed these applications and told Ms. Formoso whether to schedule these individuals for interview. In the period 1981-84, 463 pilots were hired, 19 of whom had relatives at USAir and at least 39 of whom had influential, non-relative referrals. All of these [**4] 58 applicants were white.

8. At or prior to an interview, Captains Sessa and Leefe would review the applicant's application. The first page contained the following question: "Do you have any relatives working for USAir?" They also received a summary of the person's qualifications, prepared by Ms. Formoso, which included a section "Referred by."

9. The 17 black pilots hired in 1981-1984 were processed by Ms. Formoso and, at a minimum, satisfied the written objective qualifications published in the USAir Flight Operations Manual.

10. Every pilot who was hired through the alternative hiring channel, which bypassed screening by Ms. Formoso, was white. Some of the pilots hired through this channel failed to meet the minimum objective written qualifications that USAir established. In assessing the qualifications of these applicants, the Vice President of Flying used undefined, subjective and reduced standards which were unknown to anyone else. This channel was not open to qualified black applicants.

767 F. Supp. 715, *; 1991 U.S. Dist. LEXIS 9825, **;
56 Fair Empl. Prac. Cas. (BNA) 366; 61 Empl. Prac. Dec. (CCH) P42,106

11. Captain Sidney Clark, a black pilot, testified that he was told to use the objective qualifications for pilots which were published in the USAir Flight Operations Manual. He submitted 130-140 [**5] applications of black pilots who met or exceeded the minimum qualifications to Ms. Formoso, the pilot recruitment coordinator, not to the Vice Presidents. Only 8 or 9 of these [*718] referrals were interviewed and only 3 were hired.

12. Captain Clark testified that he submitted the applications of two graduates of the United States Air Force Academy, which Captain Leefe said would be an extremely impressive credential. Neither graduate of the Air Force Academy was interviewed.

13. Captain Clark testified that he encountered such lack of success in getting qualified black applicants interviewed that he concluded that submission of an application by him resulted in detriment to the applicant. He testified that he instructed one applicant not to say that he knew Captain Clark. When that applicant said at his interview that he did not know Captain Clark, he was hired.

14. Captain Clark was a credible witness who testified without apparent bias to either party. He substantiated the failure of USAir to hire qualified black pilot applicants whose applications were hand-delivered to Ms. Formoso.

15. Philip A. Garland was an experienced airline pilot when he applied for hire with USAir by submitting a [**6] resume in March 1981 with a photograph which showed that he was a black male. He submitted a formal application in July 1981 together with a photograph.

16. Although he submitted an application in July 1981, Garland was not interviewed by USAir until October 1982 at which time he was found to be qualified. Captain Garland was hired in December 1984.

17. During the fifteen months that Plaintiff Garland waited to be called for an interview, USAir continued to interview white applicants, many of whom were less qualified than plaintiff. The court finds that USAir hired a number of white relative and influential referral applicants, as well as less or equally qualified white applicants, while Captain Garland waited to be hired.

18. Of the other nine applicants who were interviewed with Mr. Garland on October 20, 1982, all of whom were white, two were found unacceptable and one failed the simulator test. That applicant was retested on the simulator in November 1982 and found qualified. She was hired in December 1982. Of the eight candidates who were found to be acceptable, all but Captain Garland were offered positions immediately. One refused, and the other six were hired in the period [**7] November 1982 to January 1983, before Captain Garland was hired.

19. Plaintiff Garland received a lower experience rating than 24 of the 39 white pilot applicants identified as having influential non-relative referrals, despite the fact that he had more total flight hours than 37 of the 39 applicants and more multi-engine flight hours than 31 of the 39 applicants. Only 8 of the 39 were airline pilots.

20. Plaintiff Garland received a lower background rating than 19 of the 30 "influential referral group" applicants despite the fact that he had an ATP certificate and 11 members of this group did not; plaintiff had a flight engineer certificate and 26 members did not; and he had an FAA type rating on jet aircraft and 27 had neither an FAA type rating on jet aircraft nor turbo prop aircraft.

21. Professor James Kenkel concluded, and this court finds that, based on objective criteria, Captain Garland should have been given higher subjective scores for background and experience.

22. Captain Garland should have been interviewed and hired shortly after submitting his application in July 1981. USAir did not hire him with the November 1982 class when Captain Sessa testified that he was qualified [**8] or with the March 1983 class when there was no question that he had successfully completed all phases of the interview process.

23. Dr. James Kenkel, a professor in the Economics Department at the University of Pittsburgh, performed a statistical [*719] analysis of 91 individuals who had applied for pilot positions at USAir during the period in question. The results of the study are contained in a summary report and a statistical report which were filed with plaintiff's pretrial narrative statement.

24. Professor Kenkel reached the conclusion that, based on objective data which he used, Captain Garland was the most qualified applicant in his interview group and among the top eight applicants of the 91; yet he was not hired until almost three and one-half years after he had applied.

25. Professor Kenkel concluded, and this court finds that:

767 F. Supp. 715, *; 1991 U.S. Dist. LEXIS 9825, **;
56 Fair Empl. Prac. Cas. (BNA) 366; 61 Empl. Prac. Dec. (CCH) P42,106

A. USAir did not hire the most qualified applicants. Captain Garland was better qualified than many of the applicants who were hired.

B. Captain Garland was better qualified than the typical white applicant in his sample.

**C. Captain Garland was better qualified than the typical applicant who had a relative at USAir.**

D. Captain Garland was better qualified [**9] than the typical applicant who had an influential non-relative referral.

E. Captain Garland was better qualified than the typical applicant who was deficient in some way based on USAir's published hiring standards.

F. Captain Garland was better qualified than the typical applicant who applied prior to January 1, 1982; and

G. Captain Garland was better qualified than the typical applicant in his interview class.

26. Professor Kenkel opined, and this court finds that, based on his study of objective criteria which he used to evaluate Captain Garland and the other pilots in the study group, Captain Garland was discriminated against on the basis of his race.

27. USAir did not hire the best qualified pilot applicants. From Dr. Kenkel's testimony it can be concluded that Captain Garland was not hired earlier because of race.

28. The evidence by which it may be inferred that this disparate treatment by USAir was intentional is summarized as follows:

A. Captains Sessa and Leefe followed two separate standards for hiring pilots. One standard was the written qualifications in the Flight Operations Manual which Ms. Formoso and Captain Clark followed in selecting applicants for interview. That [**10] standard applied to all black applicants. The second standard was one which was relaxed when applied to select white pilots such as Robert Burdick, Robert Knapp, Charles Buttion and William Lacey. These pilots were interviewed, and at least three were hired, when they failed to meet the minimum written standards for flying experience and/or education. No black applicant had these minimum standards "relaxed" as was done for these white pilots;

B. Captain Clark's testimony proved that he took the applications of more than 100 qualified black pilots to Ms. Formoso, only 8 or 9 of whom were interviewed and only about 3 of whom were actually hired. Since the court finds Captain Clark to have been a credible witness, USAir's conduct showed an intentional disregard for the great number of qualified black applicants in the interviewing and hiring process;

**C. USAir provided different reasons for not hiring Captain Garland to the EEOC, in its answers to requests for admissions filed in discovery and in its pretrial statement filed pursuant to Local Rule 5 and at trial. These inconsistencies establish an intentional pretext for the real reason for not hiring Captain Garland which was race;**

D. [**11] USAir asserted in its pretrial statement and at trial that Captain Clark was its black pilot recruiter and that black pilot applicants were hired through him. "Thus, black pilots actually had two channels available to them: the normal channel for friends and relatives of USAir employees and the 'Sidney Clark' channel designed specifically for black applicants." This assertion was false and rebutted by Captain [*720] Clark who characterized the "Sidney Clark" channel as valueless;

E. The record supports a finding that USAir failed to use its best efforts to find and hire qualified black applicants, and that USAir intentionally failed to interview and hire qualified black applicants such as Captain Garland.

F. While USAir hired two minority pilots (Carol Lopez a female and Manuel Lopez a Hispanic) as exceptions to the LPP rule, it failed to make any similar exception for blacks.

G. USAir maintained a separate hiring channel for the benefit of white pilot applicants with relatives at USAir or referrals from influential non-relatives. The opportunities presented by access to the alternative or "Vice President's" channel were more favorable than those through the normal channel. The former channel [**12] was available to white pilots only. USAir's practice of hiring white pilots through this channel intentionally discriminated against qualified black applicants;

767 F. Supp. 715, *; 1991 U.S. Dist. LEXIS 9825, **;
56 Fair Empl. Prac. Cas. (BNA) 366; 61 Empl. Prac. Dec. (CCH) P42,106

H. Black applicants who satisfied the minimum objective standards of the Flight Operations Manual were perceived as unqualified while white pilots who did not meet these minimum objective standards were perceived as qualified. Evaluating the subjective ranking of Captain Garland on the parameters of "background" and "experience" against the objective measures of his qualifications, Dr. Kenkel concluded with respects to both parameters that the "ratings for Phil Garland [were] much lower than the ratings he should have received based on objective criteria."

29. Defendant's evidence was not credible with regard to Captain Garland and is pretextual because:

A. Captain Garland stated on his application that his furlough from Western Airlines was imminent.

B. On the interview summary form for Captain Garland under the category "previous employer" is stated "Western Airlines."

**C. Captain Sessa wrote on Captain Garland's interview sheet "should make good employee."**

D. Another Western Airlines pilot, Stephen Lapensky, a white male, [**13] was hired while he was actively employed.

E. USAir had knowledge that Western Airlines was in the process of furloughing pilots. This knowledge is established by the fact that Captain Sessa had hired at least three white furloughed Western Airlines' pilots, Thomas Bibbins, Christopher Beebe and Bill Eggers, in 1981.

F. USAir would not have gone through the expense of retesting Captain Garland on the psychological test in January and February 1983 if plaintiff was ineligible for employment because he was still actively employed at Western Airlines; and

G. Captain Garland received written notice from Western Airlines that he was furloughed as of September 1981, and he was not recalled from furlough until April 1983.

30. Defendant's evidence that it hired only the best pilot applicants was not credible because exceptions were made for whites not meeting USAir's minimum standards of 2,000 total hours including 1,000 multi-engine and/or heavy aircraft hours and a background in commercial flying:

A. In 1983 USAir hired Robert Burdick, who was white, as a favor to his father who was a USAir Captain, and who, when interviewed a year before being hired, had only 71 multi-engine hours and no [**14] commercial pilot experience.

B. In 1982 USAir hired Robert Knapp, who was white, one month after his interview at which time he had only 1,435 total hours of which 315 were multi-engine hours, and whose background was as an advertising banner pilot, as a favor to his father who was a USAir captain; and

C. In 1984 USAir hired Charles Button, who was white, while he had fewer than 2,000 total hours and 1,000 multi-engine hours as a favor to his father who was a vice president at Eastern Airlines. [**15] an advertising banner pilot, as a favor to his father who was a USAir captain; and

[*721] 31. USAir's asserted reason for not hiring Captain Garland, because he was not LPP, does not constitute a legitimate business reason and is found to be pretextual.

32. The reasons which USAir gave the EEOC for not hiring Captain Garland did not constitute legitimate business reasons and were a pretext for not hiring him because of his race.

33. The response which USAir gave during discovery in the instant case to Request for Admission number 10 for not hiring Captain Garland is as follows:

> Mr. Garland was not hired until December 1984 for a number of reasons including: (1) Mr. Garland's overall qualifications including the results of the psychological aptitude test were not as favorable as other available applicants; (2) USAir believed that he was actively employed at Western; and (3) for some periods during that time USAir was required under federal law to give a first right of hire to applicants protected [**16] under the Airline Deregulation Act and Mr. Garland was not so protected.

34. The psychological aptitude test used to screen applicants, ASI, was not validated by USAir. Captain Leefe testified that the results of the ASI, which was ultimately abandoned by USAir with no discernable effect on the ability to evaluate applicants, were not used to disqualify an otherwise qualified candidate. Captain Garland successfully completed the interview process, including the simulator test and the physical, and was otherwise qualified for hire in October 1982.

767 F. Supp. 715, *; 1991 U.S. Dist. LEXIS 9825, **;
56 Fair Empl. Prac. Cas. (BNA) 366; 61 Empl. Prac. Dec. (CCH) P42,106

The explanation that the ASI result was "not as favorable as [for] other available applicants" was likewise a pretextual reason for not hiring him. At a minimum, USAir has conceded that Captain Garland obtained a substantially better result on the ASI retest in February 1983 yet he was not hired into the March 29, 1983 class.

35. USAir asserted a new defense at trial when Captain Sessa testified that Captain Garland lacked pilot in command multi-engine time because so much of his time was served as a second officer on the B-737. Nowhere in the USAir Flight Operations Manual did it state that the multi-engine time had to be pilot in command [**17] time. Captain Garland's application and interview summary indicate that he had 5,000 hours total flight time with 3,000 of those attributable to multi-engine/heavy aircraft.

36. The evidence demonstrates the existence of a specific hiring practice maintained by USAir which has been operated for the benefit of white applicants, particularly those with relatives at USAir or who were referred to the Vice Presidents of Flying by influential persons.

37. The white applicants were routed through a "back door" directly to the Vice Presidents of Flying, or "Vice President's Channel," and as a result were the beneficiaries of a relaxation of the stated objective minimum qualifications of the Flight Operations Manual. Applicants through the "Vice President's Channel" were interviewed and in some cases hired with less than the minimum stated objective qualifications.

38. Captain Sessa testified that he could "bend the rules" for those who came highly recommended by allowing the interview and even hire an applicant with qualifications below the stated written minimum qualifications. This preferential treatment in deviation of stated company policy was accorded to white applicants alone.

39. No [**18] black applicants were interviewed or hired through the "Vice President's Channel." Each black applicant hired by USAir, including Captain Garland, was interviewed and hired only after he passed the screening process of the recruitment coordinator who determined that he met or exceeded the objective minimum qualifications.

40. Being interviewed via the alternative "Vice President's channel" was an important factor in being favorably considered for hire as a pilot for USAir.

41. A pilot applicant whose application was processed via the alternative "Vice President's channel" would be interviewed [*722] and hired in a relatively short period of time compared to those, including Captain Garland, who went through Ms. Formoso's screening process.

42. Samuel Kademenos was a personal friend of and referral from Captain Sessa, while he was the Vice President of Flying.

43. Mr. Kademenos submitted his application on September 27, 1982; Mr. Sessa interviewed him and Captain Garland on October 20, 1982; and he was hired in November 1982 while Captain Garland was passed over.

44. Despite efforts of Defendant USAir to characterize a separate but equal path for blacks, denominated as the "Sidney Clark Channel," [**19] the uncontroverted testimony of Captain Clark, a credible witness, was that no such channel existed. Applications received from Captain Clark were forwarded to the recruitment coordinator for her ordinary screening process. Captain Clark testified that he had no direct access to the Vice Presidents.

45. Defendant's effort at trial to characterize the "Vice President's Channel" as a "single back door" available to blacks and whites equally was discredited by the testimony. The evidence revealed that the access to the "Vice President's Channel" was available to white pilot applicants exclusively. Captain Clark's testimony confirmed that USAir employed a hiring practice which had a disparate impact on qualified and available black applicants.

46. The significance of this separate employment practice to USAir is demonstrated by its employment application which on its face asks, "Do you have any relatives employed by USAir?", by its interview summary sheet which on its face requests the name of the individual the applicant was "Referred by," and manifested by the deference accorded the minimally qualified applicants processed through the "Vice President's Channel," by the relative speed [**20] with which applicants were interviewed and hired through this channel and by the practice of a set aside or quota of one vacancy for every two hiring classes of pilot applicants through this channel.

47. USAir has failed to prove any business justification for the maintenance of the discriminatory alternative channel. Captains Sessa and Leefe testified that they were inundated with qualified pilot applicants such that they could pick the "cream of the crop." Similarly, both Vice Presidents testified that there was a dearth of qualified black applicants. No business justification is present in the maintenance of an all white recruitment and hiring channel when there was an

767 F. Supp. 715, *; 1991 U.S. Dist. LEXIS 9825, **;
56 Fair Empl. Prac. Cas. (BNA) 366; 61 Empl. Prac. Dec. (CCH) P42,106

ample availability of qualified whites and an asserted dearth of qualified black applicants. USAir's efforts to justify the maintenance of the "Vice President's channel" by contending that a separate but equal channel was available to blacks through Captain Clark is not supported by the evidence. The attempt by USAir to prove that the results of the operation of this hiring practice were *de minimus* is unpersuasive. The evidence demonstrates the hiring of at least 58 relatives and influential non-relative referrals **[**21]** out of 463 hires during the pertinent period and the perpetuation of this practice operated to the detriment of 50 to 60 qualified and available black pilot applicants provided by Captain Clark during this same period.

48. USAir had a policy that a pilot who was flying to his destination in order to commence a flight could fly in the "jump seat," i.e., an extra seat in the cockpit, if she reserved it in advance. In 1987 Captain Garland was subjected to several incidents wherein he was ejected from the "jump seat," which he had reserved, by white pilots because he had filed the instant suit. At a preliminary hearing held in September 1987 USAir took the position that it could not take remedial action because the pilots who ejected Mr. Garland were the captains of the ship.

49. By condoning these attacks on Captain Garland by its white pilots, USAir has failed to protect Captain Garland's right to **[*723]** be a litigant in the federal courts for which injunctive relief is required.

50. Captain Garland was subjected to other incidents of harassment which had a racial/retaliatory animus: Captain Kaufman, an officer of defendant Air Line Pilots Association ridiculed Captain Garland in front of **[**22]** other pilots as being the one who sued the company. This was an attempt to ostracize Captain Garland. Other captains wrote letters to Captain Leefe which unfairly criticized Captain Garland. Not only did Captain Leefe fail to take corrective measures against these captains who harassed Captain Garland, but he himself harassed Captain Garland by insisting that Captain Garland, but not similarly situated white pilots, resign his seniority from Western Airlines while he was still in his first probationary year at USAir.

CONCLUSIONS OF LAW

1. [HN1] Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer:

> To fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race [or] color . . . .

42 U.S.C. § 2000e-2 (a)(1). Not only does Title VII prohibit the failure to hire an individual on account of race or color, it provides additional protection in that it is unlawful for an employer:

> To limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any **[**23]** individual of employment opportunities . . . .

42 U.S.C. § 2000e-2 (a)(2).

2. Captain Garland's claim that USAir's failure to hire him until December 1984 is also actionable under [HN2] 42 U.S.C. § 1981 which guarantees black citizens the same right "to make and enforce contracts . . . as is enjoyed by white citizens." The legal standards for establishing a right to relief under a § 1981 failure to hire claim are the same as those which have been adopted for proving a Title VII case. *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S. Ct. 2363, 2377-2378, 105 L. Ed. 2d 132 (1989).

3. Captain Garland has proffered two theories of a discriminatory failure to hire which are supported by the evidence: disparate treatment and disparate impact. Initially, he has proven by a preponderance of the evidence that he was the victim of disparate treatment on account of his race. That is, USAir continued to interview and hire lesser or equally qualified whites while taking no action on his own application. The evidence further establishes, and the court concludes, that USAir acted with discriminatory intent and that USAir's asserted reasons for not interviewing or hiring Captain Garland are pretextual. **[**24]** Secondly, the evidence establishes that Captain Garland was the victim of a specific hiring procedure having an adverse disparate impact on blacks. The specific policy challenged by Captain Garland was USAir's operation of a Vice President's hiring channel, unsupported by any legitimate business justification, which granted special preference to white applicants with relatives employed by USAir or with influential references.

4. [HN3] Where the use of non-job related criteria, such as whether an applicant is related to another employee, or whether an applicant is supported by an influential individual, has an adverse impact on the employment opportunities of minority applicants, employment discrimination is present. *Connecticut v. Teal*, 457 U.S. 440, 102 S. Ct. 2525, 2531, 73 L. Ed. 2d 130 (1982).

767 F. Supp. 715, *; 1991 U.S. Dist. LEXIS 9825, **;
56 Fair Empl. Prac. Cas. (BNA) 366; 61 Empl. Prac. Dec. (CCH) P42,106

5. According to the evidence presented to the court, USAir hired less qualified pilots than Captain Garland. Examples of differential treatment on account of race are the 17 white flight officers with relatives employed at USAir and 39 white flight officers whose employment applications were supported by non-relative influential [*724] referrals who were hired, during the pertinent time [**25] period. Special preference was given to these white applicants and word of mouth hires, some of whom did not meet USAir's written objective minimum hiring standards. No black applicant was accorded the preferred treatment and consideration given to this pool of white applicants.

6. In *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 1094, 67 L. Ed. 2d 207 (1981); the Court, commenting on the allocation of burdens set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), noted that [HN4] a plaintiff need only prove that he applied for a position for which he was qualified "but was rejected under circumstances which give rise to an inference of unlawful discrimination." Captain Garland satisfied the burden of proving a prima facie case of disparate treatment race discrimination as follows:

A. He presented convincing evidence that he was a qualified black applicant who was eligible for employment as a flight officer with USAir when he submitted his employment application in July, 1981. Captain Garland was not interviewed by USAir's Vice President of Flying until October, 1982. [**26] He was not offered employment until after he filed a charge of employment discrimination with the EEOC in November, 1984;

B. During the time Captain Garland was waiting to be called for an interview, USAir continued to interview white applicants, many of whom were not as objectively qualified as Captain Garland. Some of these qualified white applicants were interviewed either as the result of having a relative or other influential sponsor. The evidence also establishes that USAir continued to hire white relative and influential referral applicants, as well as lesser qualified white applicants, during the three years between Captain Garland's application in 1981 and his hire in 1984; and

C. Captain Garland was the only black in his October, 1982 interview class. Seven of the other nine members of his interview class were offered employment before Captain Garland. Six of the seven accepted and were hired within three months of the interview. The time lag between the submission of Captain Garland's application and his ultimate hire exceeded the average time lag for many whites with relative employees, influential referrals or deficiencies in the objective hiring criteria identified [**27] by USAir.

7. USAir attempted to counter Captain Garland's prima facie case by denying that it treated Captain Garland less favorably than whites who had applied during the same time period. The court gives credence to the evidence that specific white applicants were given preferential treatment. Thus, from the admission of two former Vice Presidents of Flying that "exceptions" were made to allow in certain whites who did not meet minimum standards, as well as the differences between USAir's description of the Sidney Clark channel through which it maintains blacks were recruited and the testimony of Sidney Clark, who this court finds to be both neutral and credible, the court concludes that USAir's denial lacks credibility.

8. [HN5] As a consequence of Captain Garland satisfying his burden of establishing a prima facie case, the burden shifted to USAir to articulate a legitimate, non-discriminatory reason for its failure to hire Captain Garland until December, 1984. *Burdine*, 101 S. Ct. at 1093. Reasons which are first articulated after initiation of the lawsuit are suspect and considered by the court to be self serving. *Healy v. New York Life Insurance Co.*, 860 F.2d 1209, 1215 (3d Cir. 1988). [**28]

9. The non-discriminatory reasons which have been articulated by USAir for not hiring Captain Garland have shifted over time and must be carefully scrutinized. This court concludes that the reasons articulated by USAir lack credibility and are pretextual:

A. USAir maintains that it followed a practice, widely accepted in the airline industry, of not hiring flight officers who were currently flying for other major carriers. USAir further maintains that Captain [*725] Garland was not offered a position when interviewed in 1982 because it did not know Captain Garland had been laid off by his former employer, Western Airlines. As previously noted, this proffered reason lacks merit and was rebutted: Captain Garland's 1981 employment application indicated that he was awaiting an "imminent furlough" from Western Airlines; USAir only interviewed those applicants it thought were employable; Plaintiff's Exhibit 7 included USAir's own written summary from Captain Garland's October, 1982 interview which identified Captain Garland's "previous employer" as Western Airlines; Captain Garland's unrebutted evidence also revealed that USAir was hiring furloughed white Western Airlines' pilots during the time [**29] his application was pending, thus establishing USAir's knowledge of Captain Garland's

767 F. Supp. 715, *; 1991 U.S. Dist. LEXIS 9825, **;
56 Fair Empl. Prac. Cas. (BNA) 366; 61 Empl. Prac. Dec. (CCH) P42,106

furlough status. Captain Garland has established that the aforementioned nondiscriminatory reason advanced by USAir for not hiring him was pretextual. *See, Bellissimo v. Westinghouse Electric Corp.*, 764 F.2d 175 (3d Cir. 1985);

B. USAir also maintained that it could not hire Captain Garland between October, 1983 - August, 1984 due to the Airline Deregulation Act, 49 U.S.C. § App. 1552. Under applicable regulations, the airlines had to give preference to displaced pilots who had been flying for four years prior to 1978. Captain Garland has convinced the court of the pretextual nature of this excuse for not hiring him. The evidence demonstrated, due to the dearth of black pilots with a 1974 major carrier seniority date, that those hired pursuant to LPP would be almost exclusively white males. With knowledge of the impact LPP would have on the minority composition of the work-force, USAir made exceptions so as to hire one white female and one Hispanic male. No reason was proffered by USAir as to why a similar exception was not made for Captain Garland or any other black applicant. [**30] Finally, USAir's practices under the LPP do not explain why Captain Garland was not offered employment either before October, 1983 or immediately after August, 1984 when 15 months had elapsed without the hiring of more than a single black;

C. USAir maintained at trial that Captain Garland's qualifications were weak in the area of multi-engine hours flown. When Captain Garland applied in 1981, USAir required its pilots to have a minimum of 1,200 hours total flight time with a large percentage of that being on a multi-engine or heavy aircraft. This requirement was later changed to 2,000 total hours with 1,000 hours multi-engine or heavy aircraft time. Captain Garland's 1981 application and USAir's own summary of the October, 1982 interview reveal that he had in excess of 5,000 hours total flight time with 3,000 hours multi-engine experience. Thus, Captain Garland's flight time was above that required by USAir. USAir attempted to minimize the significance of Captain Garland's flight experience at trial by characterizing the bulk of it as second officer time. Nothing in USAir's Flight Operation's Manual, which sets forth the minimum objective qualifications for pilots, indicates that [**31] second officer flight time is to be treated any differently than other flight time. USAir's distinction concerning Captain Garland's flying experience is belied by the written comment of Captain Ronald Sessa, USAir's Vice President of Flying who interviewed Captain Garland, that Captain Garland "should make [a] good employee." Captain Garland has met his burden of proving the pretextual nature of this proffered nondiscriminatory reason; and

D. Finally, USAir attempts to justify its actions on the grounds that Captain Garland did not perform satisfactorily on its psychological screening test known as the ASI. As previously noted, this court has already found that the ASI, an unvalidated psychological test ultimately abandoned by USAir without any discernable effect on the ability to evaluate applicants, was not a disqualifier for employment. It is quite possible, if USAir had interviewed and tested Captain Garland in a more timely manner, he would have performed as well on the ASI as when he was retested in early 1983. Since USAir did not offer Captain Garland employment for two years after he [*726] completed the ASI, this court finds that USAir was not truthful in its stated reason. Pretext [**32] is therefore inferred.

10. Captain Garland has persuaded the court that he was treated less favorably than equally or less qualified whites on account of his race. *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S. Ct. 1478, 1482, 75 L. Ed. 2d 403 (1983). He therefore met his ultimate burden of proving that USAir intentionally discriminated against him. *Burdine*, 101 S. Ct. at 1093. In concluding that there was intentional discrimination, the court relies upon the following matters each of which, standing alone, is sufficient to establish the requisite intent in the context of this case: USAir's operation of a distinct nepotistic/word of mouth hiring channel which benefitted whites only, *EEOC v. Metal Service Company*, 892 F.2d 341, 350 (3d Cir. 1990); *Gibson v. ILWU, Local 40*, 543 F.2d 1259 (9th Cir. 1976); USAir's use of a hiring practice which gives preferential treatment to whites and has a disparate impact on black applicants (see conclusions *infra*), *Green v. USX Corp.*, 896 F.2d 801, 807 (3d Cir. 1990); USAir's failure [**33] to uniformly follow the published objective hiring criteria appearing in the Flight Operations Manual (standards were relaxed for white applicants while heightened subjective standards were used in the screening of black applicants); the EEOC determination of reasonable cause, *Smith v. American Service Company*, 611 F. Supp. 321, 329 (D.C.Ga. 1984); the failure of USAir to make reasonable efforts to follow through with its stated goal of actively recruiting qualified black pilots, *see, Gonzales v. Police Department of San Jose*, 901 F.2d 758, 761 (1990); USAir's assertion that it was not receiving applications from qualified black pilots when the credible evidence shows that Captain Clark submitted between 130-140 applications on behalf of qualified black pilots; that USAir failed to hire even one black as an exception to LPP while exceptions were made for other minorities; the maintenance of a black applicant file containing approximately 10 applications when in excess of 130 such applications had been submitted by Captain Clark; as well as this court's negative assessment of USAir's credibility concerning the existence and operation [**34] of a Sidney Clark Vice President's channel for the exclusive benefit of black applicants.

11. This court also concludes that Captain Garland has met the burden of proving discrimination [HN6] under a theory of disparate impact. Under this analysis, Captain Garland must identify a specific hiring practice that "has a signifi-

767 F. Supp. 715, *; 1991 U.S. Dist. LEXIS 9825, **;
56 Fair Empl. Prac. Cas. (BNA) 366; 61 Empl. Prac. Dec. (CCH) P42,106

cantly disparate impact on employment opportunities for whites and nonwhites." *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 109 S. Ct. 2115, 2125, 104 L. Ed. 2d 733 (1989). In the instant case, the challenged practice is USAir's operation of a separate hiring channel which is available exclusively to favored white applicants. Pursuant to *Wards Cove*, 109 S. Ct. at 2121, 2124 n. 9, this court has compared the racial composition of the "at issue jobs" (those filled through the Vice-President's channel), which is all white, to the qualified applicant pool. Given the available qualified black applicant pool as testified to by Captain Clark, this court concludes that USAir's maintenance of an all white nepotistic/word of mouth hiring channel has a disparate impact on blacks. *See NAACP v. Town of Harrison*, 749 F. Supp. 1327, 1337 (D.N.J. 1990). [**35]

12. By way of a defense to a disparate impact claim, USAir is entitled to offer evidence of a business justification for the challenged practice. USAir has offered no evidence to justify operation of a Vice-President's channel which only benefits white nepotistic/influential word of mouth applicants. Given USAir's testimony that it had fallen short on its minority recruitment goal and was therefore interested in hiring all qualified black applicants, the court can find no legitimate justification for the maintenance of employment practices such as the Vice President's channel, nepotistic/word of mouth channel, application entries which would reveal the existence of relatives and interview summary entries concerning referrals, each of which have resulted in the hire of whites only. The court further finds that USAir's "set [*727] aside" for nepotistic applicants of one space in every other hiring class had the effect of perpetuating discriminatory practices and displacing qualified black applicants, such as Captain Garland and those referred by Captain Clark.

13. Rather than offering evidence as to the business justification for its practices, USAir attempted to show that its percentage of [**36] black pilots exceeded that which would have been indicated if the appropriate labor market were defined by census statistics. The use of statistics based upon census data by USAir is dubious where, as here, there was an identified qualified pool of actual black applicants. Even if accurate, the court rejects the use of USAir's bottom line statistics to rebut Captain Garland's case because [HN7] such statistics are irrelevant to the determination of whether an individual was discriminated against or whether the particular challenged practice has a disparate impact on Captain Garland or blacks as a group. *Wards Cove*, 109 S. Ct. at 2123 n. 8; *Connecticut v. Teal*, 457 U.S. 440, 102 S. Ct. 2525, 73 L. Ed. 2d 130 (1982).

14. The evidence also established that Captain Garland was subjected to racial harassment and retaliation which was sufficiently severe to alter his employment conditions "and create an abusive work environment." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S. Ct. 2399, 2405, 91 L. Ed. 2d 49 (1986). Captain Garland has shown that he was subjected to a pattern of mistreatment by co-employees after filing his charge [**37] against USAir with the EEOC. This mistreatment, which took the form of being denied cockpit jump seat privileges, public ridicule and professional ostracism, impaired Captain Garland's ability to perform scheduled work and caused other harm to him. The court is persuaded that the complained of treatment was directly linked to Captain Garland's race and his pursuit of legal remedies and that the harm suffered by him would also have been suffered by other similarly situated reasonable people. The court is further persuaded that USAir refused to take adequate steps to remedy the hostile work environment and guarantee Captain Garland the rights and privileges to which he was entitled by virtue of his employment. Conditions did not improve until after Captain Garland sought preliminary injunctive relief. The court thus concludes that Captain Garland met his burden of proving harassment and retaliation. *See Andrews v. Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990).

15. The court concludes that Captain Garland was subjected to prohibited employment discrimination as early as 1981. Since Captain Garland's application remained active, the discrimination amounted [**38] to a continuing violation which did not cease until Captain Garland's employment in December, 1984. The court also concludes that Captain Garland had no notice of this continuing violation until shortly before filing an EEOC charge in November, 1984. [HN8] The court is constrained, however, from awarding relief under Title VII which goes back more than two years from the date of filing of a charge of discrimination with the EEOC. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S. Ct. 2362, 45 L. Ed. 2d 280 (1975). The court therefore finds that Captain Garland is entitled to full back wages, benefits and seniority rights retroactive to November 13, 1982, *International Brotherhood of Teamsters v. Teamsters v. U.S.*, 431 U.S. 324, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977). Pursuant to his § 1981 claim, Captain Garland is entitled to compensatory damages for the pain and suffering occasioned by USAir's deprivation of his right "to make and enforce contracts . . . [on the same basis] as is enjoyed by white citizens." Captain Garland is also entitled to a declaratory judgment with respect to the discrimination to which he has been subjected. Injunctive relief, [**39] enjoining USAir from pursuing its discriminatory hiring practices which include an all white Vice President's channel and an all white nepotistic/word of mouth channel, shall also be issued.

16. At the reconvened hearing, this court shall hear evidence and argument so as to make specific determinations on the amount of damages to be awarded, including [*728] back wages as of November 13, 1982 and compensatory damages

767 F. Supp. 715, *; 1991 U.S. Dist. LEXIS 9825, **;
56 Fair Empl. Prac. Cas. (BNA) 366; 61 Empl. Prac. Dec. (CCH) P42,106

under 42 U.S.C. § 1981, the form of declaratory and injunctive relief to enter and whether other relief would be appropriate to award in this case.

# EXHIBIT # 2

5 of 64 DOCUMENTS

The Washington Times

May 1, 1991, Wednesday, Final Edition

# USAir pilots seek $2.4 million damages

**BYLINE:** Todd Smith; THE WASHINGTON TIMES

**SECTION:** Part C; MONEY; METRO FIRMS; Pg. C3

**LENGTH:** 108 words

Two black pilots who won a discrimination lawsuit against USAir asked a federal judge yesterdayco tuesday to award them about $2.4 million in damages and missed paychecks.

John Pushinsky, attorney for pilots Larry C. Taylor and Phillip Garland, said they should receive about $1.2 million in lost wages and about $1.2 million in compensatory and punitive damages from the airline.

U.S. District Judge Donald Ziegler, who ruled Friday that Arlington-based USAir discriminated against the two when it didn't hire them in 1982, will hear more testimony Friday.

Both men were later hired by USAir and still work for the airline.

**LANGUAGE:** ENGLISH

Copyright 1991 The Washington Times LLC
All Rights Reserved

# EXHIBIT # 3

4 of 64 DOCUMENTS

**PHILIP A. GARLAND, Plaintiff, v. USAIR, INC., et al., Defendants. LARRY CUR-TIS TAYLOR, Plaintiff, v. USAir, Inc., et al., Defendants**

**Civil Action Nos. 86-890, 86-1943**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**1991 U.S. Dist. LEXIS 12393; 56 Fair Empl. Prac. Cas. (BNA) 377**

**June 10, 1991, Decided**

**SUBSEQUENT HISTORY:** [*1] As Amended June 11, 1991.

**CORE TERMS:** flight officer, seniority, harassment, interview, hiring, bid, adjusted, recruitment, vacation, hire, minimum qualifications, pilot, basis of race, retroactive, settlement, desist, cease, attorney's fees, civil actions, certain employee, cover letter, time limit, qualification, impermissible, job-related, interviewee, screening, liaison, flight, resumes

**JUDGES:** Donald E. Ziegler, United States District Judge.

**OPINION BY:** ZIEGLER

**OPINION**

ORDER OF COURT

AND NOW, this *10th* day of June, 1991, the court having been advised that plaintiffs, Philip A. Garland and Larry Curtis Taylor, and defendant, USAir, Inc., have resolved all issues of back-pay, front-pay, compensatory damages, counsel fees and seniority,

IT IS ORDERED that judgment be and hereby is entered as follows:

1. USAir shall make payment of damages, attorney's fees and costs in the manner specified by the separate confidential Settlement Agreement of the parties. Such agreement shall constitute a full and complete settlement of all monetary damages, attorney's fees and costs associated with these civil actions.

2. USAir be and hereby is prohibited from conducting its flight officer selection process in a manner which discriminates against applicants on the basis of their race as follows:

A. USAir shall cease and desist from the practice of employing separate standards and procedures for recruitment, interview and hire. USAir shall employ uniform qualification standards and procedures for the recruitment, interview and hire of flight officer applicants without regard to race [*2] or relationship to current employees.

B. USAir shall cease and desist from use of the "Vice President's channel" as a separate recruitment, screening, interview and hiring procedure. USAir shall eliminate any quota or set aside for the hiring of any relative or referral by an influential non-relative. USAir shall issue appropriate notice to all persons involved in the recruitment and selection procedure for flight officers that the usage of such procedures has been found to be discriminatory on the basis of race and that such procedures shall no longer be employed.

C. For a period of thirty months after USAir resumes flight officer hiring, USAir will undertake the recruitment of qualified black applicants which shall include but not be limited to notification of black pilot organizations such as the Organization of Black Airline Pilots that USAir is accepting flight officer applications and the place-

1991 U.S. Dist. LEXIS 12393, *; 56 Fair Empl. Prac. Cas. (BNA) 377

ment of advertisements in local and national media aimed at black audiences and in periodicals, journals and newsletters aimed at black professionals.

D. USAir will provide all interested parties, including applicants, with an information sheet listing the minimum qualifications for hire [*3] as a flight officer.

E. USAir shall not consider any applicant's relationship to an employee or the identity of any person referring the applicant for employment in the processing of an applicant for the position of flight officer except as required by USAir policy designed to prevent the hire of certain employee relatives or the assignment of certain employee relatives.

F. USAir shall designate its Human Resources Department as the authorized recipient of flight officer applications. All flight officer applications received by other USAir employees, officers and directors will be forwarded to the Human Resources Department without a cover letter or memo indicating anything other than the application had been received in the wrong office. If cover letters or memos are received by the Human Resources Department with impermissible communication, said impermissible communication shall be discarded.

G. All flight officer applications will be screened centrally by an Employee Relations Representative from the Human Resources Department. No flight officer applicant may be selected for an interview or for hire who does not meet or exceed the published minimum qualifications.

H. The minimum [*4] qualifications shall not include any unpublished standards. Any minimum qualifications which exceed those presently stated in the Flight Operations Manual shall be job-related and validated as job-related and non-discriminatory prior to their implementation.

I. With respect to flight officers applicants, USAir shall cease and desist from the practice it has called the "courtesy" interview by which a less than minimally qualified applicant is accorded an interview. Such interviews shall not be employed for any purpose.

J. Employment professionals from USAir's Human Resources Department will be responsible for its affirmative action efforts with respect to flight officer hiring and will be involved in the screening and selection of applicants for flight officer positions.

K. To the extent that USAir employs an applicant or interviewee assessment which includes the assignment of subjective scores to applicant or interviewee qualifications or characteristics, it shall prepare and make available to all interested persons the criteria by which scoring will be conducted.

3. USAir be and hereby is prohibited from harassing or condoning the harassment of flight officers on account of their [*5] race or their pursuit of legal remedies available for employment discrimination or harassment on the basis of race as follows:

A. USAir shall publish a statement in the appropriate publication or by other means to its flight officers that it will not tolerate harassment of flight officers or other personnel on the basis of race. Flight officers shall be notified of USAir's internal procedures for reporting, investigating and adjudicating allegations of prohibited harassment or discrimination.

B. Within 45 days of the entry of this order, USAir shall appoint a black employee to act as a liaison between black flight officers and USAir. The liaison shall make him or herself available to black flight officers to discuss: (1) perceived discrimination in the hiring process; (2) informal or formal complaints about racial discrimination or harassment on the job.

C. When a complaint of prohibited harassment or discrimination is received, USAir shall conduct a prompt investigation. If it is determined that harassment or discrimination has occurred, USAir shall take appropriate measures to guarantee the affected employee with a work environment free of prohibited harassment or discrimination.

[*6] 4. Consistent with the Findings of Fact and Conclusions of Law of this court, plaintiffs Taylor and Garland be and hereby are awarded immediate retroactive seniority for all purposes under the seniority provision of the collective bargaining agreement between defendant USAir and Rule 19 Defendant Air Line Pilots Association, which seniority shall be implemented as follows:

A. The seniority of Larry Curtis Taylor will be adjusted as if he had been hired on December 14, 1982, which places him on the current seniority list between M.H. Weaver and D.W. Ward.

1991 U.S. Dist. LEXIS 12393, *; 56 Fair Empl. Prac. Cas. (BNA) 377

B. The seniority of Philip A. Garland will be adjusted as if he had been hired on November 13, 1982, which places him on the current seniority list between G.M. Ward and D.S. Ram.

C. Plaintiffs will exercise their adjusted seniority for the purpose of participating in the next pilot system bid (Bid 91-3) and thereafter. Plaintiffs will be paid at the rate of domicile bid positions awarded to them as a result of Bid 91-3 effective with the applicable dates of the award. In addition, plaintiffs will be paid the rate of pay applicable to their first awarded position from Bid 91-3, retroactive to June 1, 1991. Payment of all accrued back [*7] pay retroactive to June 1, 1991 shall be made in one lump sum payment within 30 days after the Bid 91-3 awards are final.

D. Plaintiffs' sick leave, vacation leave and pension credit will be adjusted according to their adjusted seniority dates. The additional accrual of vacation will be included in their bid for vacation to be taken in 1992. Additionally, plaintiffs may take a portion of their adjusted vacation immediately following execution of this Settlement Agreement. Plaintiffs shall put such vacation request in writing to their Manager. USAir shall agree to any reasonable request that will not adversely affect its operational requirements.

5. The injunctive relief setting forth hiring and employee relations procedures not otherwise required by law, shall be required for a period of three years after USAir resumes flight officer hiring. Specifically, this time limit applies to sub-paragraphs E, G, H, I and K of paragraph 2 and subparagraph B of paragraph 3 and no others. Subparagraph C of paragraph 2 shall be subject to the time limit set forth in such subparagraph.

6. The court shall retain jurisdiction of these civil actions for purposes of enforcement of this order and judgment.

[*8] This ORDER is hereby entered this *10th* of June, 1991, as the final judgment in the above captioned actions.

# EXHIBIT # 4

2 of 64 DOCUMENTS

USA TODAY

May 30, 1991, Thursday, FINAL EDITION

# BIAS IN THE SKIES;
# Trying to fly in the face of discrimination

**BYLINE:** James Harney

**SECTION:** NEWS; Pg. 1A

**LENGTH:** 1233 words

USAir Pilot Philip Garland will never forget the message scrawled on a piece of his mail at Pittsburgh Airport: "Nigger, go home."

"That's when it first hit me," Garland says of the 1987 incident, "that all the resistance I was getting was not because I had brought discrimination charges against USAir, but just because I was black."

Garland, 37, fought discrimination at the airline for four years before getting his captain's wings in 1988. Earlier this month, a federal judge ruled he and fellow pilot Larry Taylor are entitled to up to $ 1 million in back pay.

Thousands of other qualified minority applicants have likewise been stymied in efforts to get jobs as pilots, flight engineers and flight attendants on major carriers by a system they say is racially and sexually discriminatory.

"Blacks are underrepresented everywhere in the managerial, professional and technical occupations, but nowhere are they as underrepresented as in the airline pilot's category," says Bureau of Labor Statistics economist Peter Cattan.

Of the nation's 50,000 major airline pilots, 300 or 0.6% are black, according to bureau figures. By comparison, 0.9% of architects, 0.8% of farmers, 31% of nursing aides and hospital orderlies, 25% of postal clerks are black. The airlines have a somewhat better record hiring women (5.1%) and Hispanics (3.3%) as pilots and flight engineers.

Still, "race relations have a long way to go," says Garland. "White men think it's a white man's job."

Says Taylor: "The bottom line is you've got to be well above average, if you're black, to make it as a pilot, because people will do a lot of little things to make it difficult for you."

"Phil and I were able to make it because by the time we applied to USAir, we were experienced. We'd seen it all, and were prepared ... prepared not to trust them."

Courts and federal agencies are beginning to crack down:

- This week, a Minneapolis federal judge OK'd a settlement in which Northwest Airlines will spend $ 3.5 million on an affirmative action program to satisfy a discrimination suit brought on behalf of 4,000 black employees and applicants.

- Earlier this month, Milwaukee's Equal Employment Opportunity Commission office found Northwest had discriminated against Asian and Hispanic women in setting a 5-foot-2 height requirment for flight attendants. The ruling cited statistical evidence that Asian and Hispanic women are shorter than white women.

Rulings and settlements, however, don't begin to reflect what goes on in the workplace, minorities say.

Garland says white USAir examiners would try to sabotage his prog-ress by removing important items from the cockpits of flight simulators he was training on, or would simply refuse to work with him altogether.

BIAS IN THE SKIES;Trying to fly in the face of discrimination USA TODAY May 30, 1991, Thursday, FINAL
EDITION

Once, Garland says, when he was still a flight engineer and preparing for a flight, USAir's chief pilot called and said he was being taken off the flight "because the captain didn't want to fly with me."

"A week later, the chief pilot called me and asked me if I had tried to pick up another flight that day," Garland says. "I told him no, that after he had taken me off that trip I wasn't going to go up to every white captain and ask if he would be willing to fly with me."

USAir spokeswoman Susan Young says the carrier "strongly disagrees" with the decision in the Garland-Taylor suit and insists it is "strongly committed to affirmative action and ... over the past few years has sought to employ as many qualified minority and female pilots as possible."

For Nimali Sondel, discrimination took a different form when she applied in 1983 to be a flight attendant at Republic Airlines (now a division of Northwest). "They told me I was too short," says Sondel, a 5-foot native of Sri Lanka.

The major airlines have argued flight attendants must be at least 5-foot-2 to reach overhead bins on commercial aircraft.

"I have traveled all around the world by air and always reached the bins by myself without any problem," says Sondel, 27, who proved to EEOC investigators that standing barefoot she has a reach of 76 inches, 4 inches more than it takes to reach the bins of a Boeing jet.

Milwaukee EEOC director Chester V. Bailey found the restriction kept nearly 50% of Mexican-American and Japanese women from applying as flight attendants, compared with 16.8% of white women.

Weight, not height, was the issue when United rejected James Norris twice for a pilot's job. "I was told that I was rejected because I weighed more than 200 pounds, but after the EEOC investigated, they learned that United has hired pilots that weighed more than I did - and had less flight experience than I had."

Norris, 44, and four other black pilots are plaintiffs in a class-action suit filed on behalf of 500 minority applicants who have unsuccessfully sought pilot and flight engineer jobs at United since 1985. "Right now, I have a total of 1,825 total hours of flight experience as a pilot, and I know for a fact that United has hired white pilots with as low as 400-600 total flying hours," Norris says.

Plaintiff Gerald Higginbotham has logged 7,728 hours of flight time for several airlines, including Eastern, but has been turned down five times for a United pilot's job. "There's a good ol' boy system still in place," he says. "The average pilot over a 30-year career can make as much as $ 5 million. They (whites) do a lot to keep that money in the family."

Craig Baptiste, a veteran black pilot who was turned down for jobs at American and United but finally hired by Piedmont (now part of USAir), says whites aren't exclusively to blame. Major airlines, he says, don't have a compelling reason to hire minorities "because we're not that unified to be able to put economic pressure on them if they don't."

The industry response to discrimination charges varies. While USAir defends its affirmative action commitment, some carriers have declined comment on such cases.

Federal Aviation Administration spokesman Bob Buckhorn says: "Discrimination is not something that is accepted, and we enforce federal rules against discrimination wherever they involve the agency."

Louis Smith of the Future Aviation Professionals of America, an Atlanta- based group that monitors industry hiring, says black job-seekers may be discriminated against even before they fill out an application: two-thirds of pilots hired in the last three years at airlines had some military experience.

"Since a lot of airlines choose pilots from a pool of those who have had military flight training, if that pool has fewer blacks or fewer women, then fewer will be offered jobs at commercial airlines," Smith says.

The battle for equality in the airline industry continues to be waged in the courts and the EEOC offices.

Northwest's settlement in the class-action suit requires it to hire a full- time minority recruiter, fund scholarships for black mechanic and pilot trainees and accelerate minority hiring and promotion.

Jane Lang, lawyer for the plaintiffs, calls it "a comprehensive decree that will change life significantly for blacks at Northwest."

Page 5
BIAS IN THE SKIES;Trying to fly in the face of discrimination USA TODAY May 30, 1991, Thursday, FINAL
EDITION

And while conceding that "things haven't really changed" that much since the day he found that racial epithet in his mailbox, Philip Garland feels his life as a USAir pilot will be easier, "now that I have the power of the court behind me."

**LANGUAGE:** ENGLISH

**GRAPHIC:** GRAPHIC; color, Source: Equal Employment Opportunity Commission (Pie charts); PHOTO; color, Bob Riha Jr., Gamma-Liaison; PHOTO; color

CUTLINE: LARRY TAYLOR: 'You've got to be well above average, if you're black, to make it as a pilot.' CUTLINE: PHILIP GARLAND: In the airline industry, 'white men think it's a white man's job.'

**TYPE:** Cover Story

See sidebar; Female pilot's friends keep her memory alive

Copyright 1991 Gannett Company Inc.

# EXHIBIT # 5

3 of 64 DOCUMENTS

The Washington Times

June 12, 1991, Wednesday, Final Edition

# USAir in pact on pilot hiring

**SECTION:** Part C; MONEY; METRO FIRMS; Pg. C3

**LENGTH:** 135 words

Arlington-based USAir has agreed to discontinue a backdoor hiring practice as part of a settlement with two black pilots who claim they were discriminated against.

U.S. District Judge Donald Ziegler in Pittsburgh formally approved the settlement Monday between USAir and pilots Philip A. Garland, 37, of Las Vegas and Larry C. Taylor, 41, of Carson, Calif.

USAir agreed to eliminate the hiring channel through which friends or relatives could contact the vice president of flying. USAir also has agreed to recruit black applicants for 30 months after the airline starts hiring new pilots and to appoint a black employee within 45 days to serve as a liaison between black pilots and USAir.

The airline also agreed to publish a statement that it will not tolerate racial harassment.

**LANGUAGE:** ENGLISH

Copyright 1991 The Washington Times LLC
All Rights Reserved

**EXHIBIT # 6**

1 of 64 DOCUMENTS

The New York Times

June 13, 1991, Thursday, Late Edition - Final

# USAir Settles Suit of 2 Black Pilots Charging Bias

**BYLINE:** AP

**SECTION:** Section A; Page 27; Column 1; National Desk

**LENGTH:** 389 words

**DATELINE:** PITTSBURGH, June 12

USAir has agreed to discontinue a hiring practice that gave preference to the relatives of employees as part of the settlement of a lawsuit brought by two black pilots who said they had been discriminated against.

Federal District Judge Donald Ziegler approved the settlement Monday between USAir and the pilots, Philip A. Garland, 37 years old, of Las Vegas, Nev., and Larry C. Taylor, 41, of Carson, Calif., who applied for jobs in the early 1980's.

Judge Ziegler ruled last month that Mr. Garland and Mr. Taylor had been denied jobs at USAir because of the informal hiring system that gave preference to friends and relatives of airline employees and discriminated against black applicants.

Both Are Flying for USAIR

Mr. Garland was eventually hired in 1984. Mr. Taylor became a USAir pilot after his previous employer, Pacific Southwest Airlines, merged with USAir in 1988.

Judge Ziegler ruled that both men were re entitled to back pay and seniority retroactive to the dates in 1982 when they should have been hired. Lawyers spent a month negotiating the terms of a final order, including the amount of back pay, damages and legal fees to which Mr. Garland and Mr. Taylor were entitled.

Both sides agreed not to discuss the case or the financial settlement. But at a hearing last month, an accountant for USAir testified that Mr. Garland was entitled to $346,611 in back pay and interest while Mr. Taylor was entitled to $545,947. Those figures were about $150,000 less than the sums calculated by an accountant for the pilots.

Under terms of the settlement, USAir has agreed to eliminate the hiring channel through which friends or relatives could notify the vice president of flying. USAir has also agreed to recruit black applicants for 30 months after the airline starts hiring new pilots and to appoint a black employee in 45 days to serve as a liaison between black pilots and USAir.

The airline also agreed to publish a statement that it will not tolerate the harassment of employees on the basis of race.

The hiring and employee relations procedures outlined in the order are to remain in effect for three years after the airline begins hiring pilots.

USAir has not set a date for the resumption of hiring pilots. Because of the drop in air travel, the airline has been laying off employees.

**LOAD-DATE:** June 13, 1991

**LANGUAGE:** ENGLISH

Page 2
USAir Settles Suit of 2 Black Pilots Charging Bias The New York Times June 13, 1991, Thursday, Late Edition - Final

Copyright 1991 The New York Times Company

# EXHIBIT # 7

# PBGC

**Pension Benefit Guaranty Corporation**

Protecting America's Pensions    1200 K Street, N.W., Washington, D.C. 20005-4026

December 13, 2007

Mr. Philip Garland
Post Office Box 33934
Las Vegas, NV 89133

Re: Appeal 2007-0141, Case No: 199334, Retirement Plan for Pilots
of US Airways, Inc. (the "Pilots Plan")

Dear Mr. Garland:

We are responding to your appeal of PBGC's September 27, 2006 benefit
determination (later amended by $0.53 in your favor on February 6, 2007) regarding
your monthly pension benefit from the Plan. For the reasons stated below, we must
deny your appeal.

### PBGC's Benefit Determination and Your Appeal

According to our records, you retired on May 1, 2004, about 13 months after
PBGC took over as trustee of the terminated Pilots Plan and which was immediately
after you attained the Pilots Plan age of early retirement (age 50). Upon your
retirement, PBGC paid you an <u>estimated</u> benefit of $1,282.67 in the form of a
Straight Life Annuity ("SLA") with no survivor benefits.

PBGC issued your initial (formal) benefit determination on September 27,
2006 and stated that you were entitled to a monthly benefit of $1,292.74 in the form
of a SLA with no survivor benefits. This formal determination was $10.07 a month
greater than your estimated benefit, and PBGC paid you a lump sum of $343.93,
which included interest, on December 1, 2006 to account for the underpayments
since May 1, 2004. Unrelated to your appeal, PBGC adjusted your benefit in your
favor by $0.53 on February 6, 2007. You are now receiving a monthly benefit of
$1,293.27 (with no tax withholding). Enclosure #1 is a copy of your PBGC benefit
statement, dated October 23, 2006, reflecting your current benefit of $1,293.27.

On November 11, 2006, you made a timely request for an extension of time
to file your appeal. That extension request was in the process of being approved
when the Appeals Board received your appeal, styled as "Philip Anthony Garland
vs. Pension Benefit Guaranty Corporation," on December 6, 2006 (PBGC date
stamp). Given your timely filed extension request, the Appeals Board considered
your appeal timely filed under our regulation.

On page 4 of your appeal, under "Statement of Issues," you raise the following four questions:

- Did the PBGC wrongfully take and receive PLAINTIFF GARLAND'S retirement account from US AIRWAYS DEFENDANTS?
- Did the PBGC upon wrongfully taking and receiving PLAINTIFF'S GARLAND'S retirement account commit another wrong by reducing his benefit on account of his age?
- Did the PBGC wrongfully submit a benefit determination that should be recalculated without the age reduction?
- Does PLAINTIFF GARLAND have some other remedy to this action committed by PBGC and US AIRWAYS DEFENDANTS?

On the last page of your appeal, under "Conclusion," your appeal states that: "PBGC DEFENDANTS have conspired to obtain or have otherwise wrongfully obtained [your] retirement benefits. After having obtained such retirement benefits, PBGC DEFENDANTS wrongfully reduce[d] [your] benefit determination solely because of [your] age violating [your] civil and equal rights."

<u>Discussion</u>

PBGC is the United States government agency that administers the federal insurance program for defined benefit pension plans. When an under-funded pension plan terminates, PBGC becomes its trustee and pays guaranteed benefits to the participants according to the plan's terms.

The Appeals Board of the PBGC is authorized by 29 C.F.R. Part 4003 to independently review specific issues raised in appeals that relate to whether PBGC calculated and determined benefits properly under pension plan provisions and applicable law and regulations. We have carefully considered the entire contents of your appeal, the arguments therein, and the issues and conclusions you raised. We will explain in detail our findings below.

We must, first, note that the Appeals Board has no authority to review or determine whether US Airways Plan should have terminated you from their employment on April 25, 2001 [the date you list] and whether this action violated federal law, as you contend in the first paragraph of your "Statement of Facts." Based on the content of your appeal, you apparently have or are continuing "to challenge this termination" in another forum. Should there be a settlement or court finding that changes your date of termination from US Airways, PBGC will always accept such evidence and recalculate your benefit.

Second, the Appeals Board cannot change the Pilots Plan's termination date. We note that, on March 28, 2003, PBGC and US Airways (as Plan Adminstrator) entered into an agreement that formally terminated the Pilots Plan and established March 31, 2003, as the termination date. See 29 United States Code ("U.S.C.") section 1348 (which authorizes PBGC and the Plan Administrator to establish termination date by agreement).

2

Your appeal at page 8 states that: "Clearly, PBGC DEFENDANTS, US AIRWAYS DEFENDANTS, and ALPA DEFENDANTS (Airline Pilots Assn. Intl.) have violated PLAINTIFF GARLAND'S civil rights and should be required to turn over the original funds in his [the Pilot's Plan] account" as of your termination dated of employment. You further claim on page 8 of your appeal that PBGC's actions are part of a conspiracy to deny you "equal protection or equal privileges and immunities." The fundamental premise underlying your argument is that you have specific dollars in the Pilots Plan with your name on them.   Such a premise, in regards to defined benefit pension plans, is in error.

Judge Stephen S. Mitchell, a United States Bankruptcy Judge for the Eastern District of Virginia, rejected a similar claim by a US Airway pilot in the US Airways bankruptcy case.  Judge Mitchell stated on pages 6-7 of his decision:

"The Retirement Plan for Pilots of US Airways, Inc. is a defined benefit plan under 29 U.S.C. § 1002(35).  A defined benefit plan is a plan that "promises to pay employees, upon retirement, a fixed benefit under a formula that takes into account factors such as final salary and years of service with the employer." [PBGC v LTV Corp..] 496 U.S. [633] at 637, 110 S.Ct. at 2671.  Under such a plan, an employee is entitled to a fixed annuity upon retirement for the remainder of the retiree's life. This type of plan does not, however, give an employee ownership over a discrete portion of the plan's assets.  An employee is only entitled to the fixed benefit under the plan upon retirement."

We are providing a copy of the entire opinion at Enclosure #2.

Because we cannot under law and regulation grant relief on your claims that you were wrongfully terminated (fired) from your job in 2001 and that you are entitled to the "original funds in [your] account" as of your termination date, we will now focus on your claim that PBGC unlawfully reduced your benefit because of your age.  We will also explain in detail how your benefit was calculated.

We note that you have not appealed the following underlying facts that directly impact your PBGC benefit:  (1) your date of birth of April 5, 1954; (2) your date of hire of November 13, 1982; (3) your date of termination of employment of July 24, 2001; (4) your normal retirement would be May 1, 2014 (age 60); or (5) your accrued Pilots Plan monthly benefit (as of the termination date) at your actual retirement date (age 50) of $3,310.69.

## ERISA's Maximum Guaranteed Benefit Limitation

Because of legal limits under the Employee Retirement Income Security Act of 1974 ("ERISA") and PBGC's regulations, the benefits that PBGC guarantees may be less than the benefits a pension plan would otherwise pay.

3

Below we will discuss how one of these limits, known as the "maximum guaranteed benefit" ("MGB," which also is referred to as the "maximum insurance limit"), affects the amount of your PBGC benefits. We will then explain how PBGC also pays benefits based on: (1) an allocation of a plan's assets as of the plan termination date (ERISA § 4044); and (2) an allocation of PBGC's recoveries on certain legal claims (ERISA § 4022(c) benefits).

The MGB establishes the maximum monthly amount of benefits that PBGC guarantees. The MGB amount depends upon the year in which the pension plan terminates. Since the Pilots Plan terminated effective March 31, 2003, the limit is $3,664.77 per month for a participant who begins receiving PBGC benefits at age 65 in the form of a SLA.

ERISA expressly defines the MGB based on "the actuarial value of a monthly benefit in the form of a straight-life annuity commencing at age 65 . . . " See 29 U.S.C. section 1322(b)(3). Because of this language, the MGB is less for participants who begin receiving their benefit payments at ages younger than 65 years because the cost of providing a benefit for their expected life is larger.

Congress, however, created a single exception to the MGB. This exception is limited to participants whose benefits are payable because of a disability that occurred on or before the pension plan's date of plan termination ("DOPT"). Because ERISA does not include a statutory exception for pilots (or for that matter any other occupational group), PBGC must reduce the age-65 MGB amount for pilots who begin receiving their PBGC benefits before age 65. PBGC is required to follow the law as enacted by Congress and, thus must actuarially reduce the MGB for pilots, or anyone else, who retires before age 65.

Congress expressly delegated to PBGC the authority to determine the actuarial values of benefits for purposes of the MGB. See 29 U.S.C. section 1322(b)(4). Based on this express delegation, PBGC issued a regulation that establishes the MGB age reduction factors for benefits that start before age 65. See 29 Code of Federal Regulations section 4022.23(c). This regulation states: "For each of the 60 months immediately preceding the 65th birthday, the reduction shall by 7/12 of 1%. For each of the 60 months immediately preceding the 60th birthday, the reduction shall be 4/12 of 1%. For each of the 120 months preceding the 55th birthday, the reduction shall be 2/12 of 1%." Thus, for participants who begin receiving their PBGC benefits at age 50, the reduction is 65%.

PBGC and Plan records show your date of birth as April 5, 1954. The governing documents of the Pilots Plan provide that your normal retirement date is May 1, 2014 (first day of the month after age 60) and that your earliest retirement date is May 1, 2004 (the first day of the month after age 50). We note that regardless of whether you were terminated by US Airways in 2001 or worked through your earliest retirement date, you would not have been able to retire any earlier than May 1, 2004.

4

Based on the Maximum Guaranteed Benefit age reduction factors discussed above, your MGB from PBGC is calculated as follows:

(1)  MGB at age 65 = $3664.77.

(2)  MGB at age 50 = $3,664.77 x Age Reduction Factor for early retirement
= $3664.77 x 1 − [(7/12 of 1% x 60 months) + (4/12 of 1% x 60 months) + (2/12 of 1% x 59 full months)]
= $3664.77 x 1 − [(.35) + (.20) + (.0983)]
= $3,664.77 x 1 − [.6483]
= $3,664.77 x .3517
= $1,288.90  (see line #2 of your benefit statement)

Because your Pilots Plan monthly benefit at your actual retirement date (May 1, 2004) was $3,310.60 in the form of a SLA (see line #1 of your benefit statement) and thus exceeded the MGB at that age, PBGC can only guarantee the MGB amount of $1,288.90, as calculated immediately above.

### ERISA Section 4044 (Allocation of Plan Assets)

You have complained in your appeal about unlawful reductions to your PBGC benefit on account of your age.  While it is true that, in many instances, pilots below age 53 on the date of plan termination will receive lower benefits from PBGC than older pilots with similar earnings and service, this is the direct result of the requirements in ERISA section 4044 concerning the allocation of a pension plan assets.  See discussion below.  PBGC and the Appeals Board must follow the terms of ERISA and applicable regulations, and therefore, we cannot increase benefits for younger pilots, such as you.

ERISA section 4044 requires PBGC to allocate a pension plan's assets, valued as of its termination date ("DOPT"), according to their priority.  Enclosure #3 is the standard PBGC information sheet that describes the categories in the order of their priority.  PBGC conducted an actuarial valuation of the Pilots Plan and determined that as of its DOPT: (1) the value of its assets was $1,193 million; (2) it had no Priority Category 1 benefits, and assets did not need to be allocated to Priority Category 2; (3) the value of Priority Category 3 ("PC3") benefits was $1,153 million; and (4) the Pilots Plan's assets were exhausted in Priority Category 4 ("PC4") – the category covering PBGC-guaranteed benefits – since there was only $39 million in assets to cover $590 million in PC4 benefits.

As discussed above, PBGC first allocated the Plan asset amount ($1,193 million) to the value of participants' PC3 benefits ($1,153 million); thus, 100% of the Pilots Plan's PC3 benefits were covered by its assets. As is shown on Enclosure #3, PC3 covers certain benefits that were in pay status, or could have gone into pay status, on the day before the beginning of the three-year period ending on DOPT (March 31, 2003). The Pilots Plan provided for early retirement at age 50. Therefore, you and other pilots who were under age 53 on March 31, 2003 do not have any benefits in PC3, since you and they were not eligible to retire three years prior to that date.

Although the Pilots Plan's assets were exhausted in PC4, PBGC is paying 100% of your PC4 benefits as guaranteed benefits. Your vested non-guaranteed benefits (i.e., your Plan benefit amounts above PBGC's MGB) are in PC5. Since plan assets did not fund all PC4 benefits, no plan assets remained to fund Priority Category 5 ("PC5") benefits. Accordingly, you do not benefit from the ERISA section 4044 allocation due to the insufficiency of the Pilots Plan's assets. While we are sympathetic to your situation, PBGC and the Appeals Board must follow the terms of ERISA and applicable regulations.

### ERISA Section 4022(c) (PBGC's Recoveries)

Section 4022(c) of ERISA authorizes PBGC to pay additional benefits based on the monies that PBGC recovers from employers that maintained under-funded pension plans. As is discussed in Enclosure #3, PBGC allocates additional money (the "section 4022(c) amount") to pay otherwise unfunded benefits in excess of guaranteed benefits. For plans like yours, in which the outstanding amount of unfunded non-guaranteed benefit liabilities exceeds $20 million, the section 4022(c) amount is based on PBGC's actual recovery on its claims against the plan sponsor. In this case, PBGC: (1) calculated the recovery under 4022(c) as $2,707,811; and (2) as required by ERISA sections 4044 and 4022(c), allocated this entire section 4022(c) amount to benefits in PC5 under 5-year old plan provisions - which PBGC had valued as $1,411,621,196. Thus, PBGC determined that the Plan's section 4022(c) amount covered only 0.19% of benefits in PC5 under 5-year old plan provisions [$2,707,811 ÷ $1,411,621,196 = 0.19%]. PBGC calculated your monthly section 4022(c) benefit amount as $4.37 per month as a SLA at your actual retirement date, using this percentage.

Thus, your PBGC monthly benefit as a SLA starting on May 1, 2004 is $1,293. 27, which is the sum of: (1) your MGB amount of $1,288.90 plus (2) your ERISA section 4022(c) amount of $4.37.

## Decision

Because you have not presented any grounds that could change PBGC's determination (*see* 29 Code of Federal Regulations §4003.54), we must deny your appeal. This is the Agency's final decision, and you may, if you wish, seek court review. If you need other information from PBGC, please contact the Customer Contact Center at 1-800-400-7242 and ask to speak to the Authorized Representative for the Plan.

Sincerely,

*Charles Vernon*

Charles Vernon
Chair, Appeals Board

Enclosures (3)
1) Your PBGC Benefit Statement dated 10/23/2006
2) Memorandum Opinion, United States Bankruptcy Court, Eastern District of Virginia, August 11, 2006
3) Description of ERISA's Priority Categories

**PBGC**
U.S. GOVERNMENT AGENCY

Privacy Act Data

# Benefit Statement

**PHILIP GARLAND**

10/23/2006 05:57 PM
Page 1 of 2

## RETIREMENT INCOME PLAN FOR PILOTS OF US AIRWAYS

PBGC Case Number:
Date of Plan Termination:

19933400
March 31, 2003

Participant's Name:

**PHILIP GARLAND**

Participant's Information
-----------------------------

| | |
|---|---|
| Social Security Number: | XXX-XX-3711 |
| Gender: | Male |
| Date of Birth: | 04/05/1954 |
| Date of Hire: | 11/13/1982 |
| Date of Termination of Employment: | 07/24/2001 |
| Participant Number: | G66721 |
| Merger Category: | US Air |
| Normal Retirement Date: | 05/01/2014 |

Summary of Participant's Benefit
-------------------------------------

| | |
|---|---|
| Actual Retirement Date (ARD): | 05/01/2004 |
| Current Monthly Benefit: | $1,282.67 |
| PBGC Monthly Benefit at Actual Retirement Date: | $1,293.27 |
| Form of Annuity: | Straight Life |

Your current monthly benefit of $1,282.67 will increase to $1,293.27 due to an Incorrect Original Maximum Insurance Limit. See benefit calculation for details.

Benefit Calculation
-----------------------

(1)    Plan Monthly Benefit at ARD as a Straight Life
       Annuity:

$3,310.69

*pg 2 of 2*

Privacy Act Data

**PHILIP GARLAND**

The benefits PBGC guarantees are limited by federal pension law to the PBGC's maximum monthly amount that was in effect on the date of plan termination. This limit is adjusted to reflect your age and form of annuity.

(2)  Maximum Insurance Limit at ARD as a Straight Life Annuity:

$1,288.90

(3)  Guaranteed Monthly Benefit at ARD as a Straight Life Annuity: lesser of (1) or (2) =
lesser of $3,310.69 or $1,288.90 =

$1,288.90

(4)  Additional Monthly Benefit due to 4022(c) at ARD as a Straight Life Annuity:

$4.37

(5)  PBGC Monthly Benefit at ARD as a Straight Life Annuity:
(3) + (4) =
$1,288.90 + $4.37 =

$1,293.27

# Description of ERISA's Priority Categories

## INFORMATION SHEET FOR 4022(c) BENEFITS

Section 4022(c) of ERISA authorizes PBGC to pay additional benefits based on the monies recovered from employers that maintained underfunded pension plans. A portion of this additional money is allocated to Unfunded Nonguaranteed Benefits -- benefits that PBGC does not normally pay.

The amount of the recoveries payable with respect to a particular plan is allocated to Unfunded Nonguaranteed Benefits, according to categories listed in ERISA Section 4044. In order of priority, the categories are as follows:

CATEGORY 1: Benefits derived from voluntary employee contributions.

CATEGORY 2: Benefits derived from mandatory employee contributions.

CATEGORY 3: Certain benefits that were in pay status, or could have gone into pay status, on the day before the beginning of the three-year period ending on the Date of Plan Termination. Benefits under this category are based on the smallest benefit available in the 5 year period immediately preceding the Date of Plan Termination.

CATEGORY 4: All other benefits guaranteed by PBGC and the benefits that are not guaranteed because of limitations under Title IV of ERISA on payments to substantial owners.

CATEGORY 5: All other nonguaranteed vested benefits under the plan. Allocation of recoveries in this category is made first to benefits under the oldest plan provisions and then to benefits contained in later amendments, in the order the amendments became effective. The oldest plan provisions considered in this category are the ones in effect during the entire 5 year period immediately preceding Date of Plan Termination.

CATEGORY 6: Non-vested benefits under the plan. Money is first allocated to the category of Unfunded Nonguaranteed Benefits with the highest priority (that is, the lowest number), then to that with the second highest, and so on until the entire amount has been expended. If the amount to cover a particular category is insufficient, the amount earmarked for that category will generally be distributed proportionally among those eligible in that category.

4022c Information Sheet (11/98)

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

In re:                          )
                                )
US AIRWAYS, INC., *et al.*       )        Case No. 04-13819-SSM
                                )        Chapter 11 (Jointly Administered)
                    Debtors     )

## MEMORANDUM OPINION
## ON OBJECTION TO ADMINISTRATIVE CLAIM
## OF THOMAS TIFFANY

A hearing was held in open court on July 20, 2006, on the objection of the reorganized debtors to the administrative claim filed by Thomas Tiffany in the amount of $600,000. Mr. Tiffany, who participated in the hearing by telephone, is employed by the debtor as an airline pilot. In a prior chapter 11 case filed by the debtor, the defined benefit retirement plan for pilots of US Airways was terminated, and the assets of the plan were turned over to the Pension Benefit Guaranty Corporation ("PBGC"), a government agency created by Congress to insure the payment of pension benefits to retirees. Mr. Tiffany's administrative claim in this case is for what he calculates as the difference between the benefit that the PBGC will pay him once he retires and what he would have received under the terminated plan. For the reasons stated, the claim must be disallowed.

### Background

US Airways, together with its parent holding company and several affiliates, filed a petition for reorganization under chapter 11 of the Bankruptcy Code in this court on September 12, 2004. This was the company's second chapter 11 filing. It had previously

1.

002449

filed a chapter 11 petition in this court on August 11, 2002. During the first case, the debtor

brought a motion to approve a distress termination of the pension plan for pilots of US

Airways, Inc. That motion was approved — subject to a determination that termination

would not violate the terms of the collective bargaining agreement — by an order entered

March 2, 2003. *In re US Airways Group, Inc.*, 296 B.R. 734 (Bankr. E.D. Va. 2003). An

appeal was taken from the order by a group of retired pilots but was dismissed on equitable

mootness grounds. *Retired Pilots Ass'n of US Airways, Inc. v. US Airways Group, Inc.*, 369

F.3d 806 (4th Cir. 2004). A plan was confirmed in the first case on March 18, 2003, under

which allowed unsecured claims (except for a convenience class of small claims) would not

be paid in cash but would instead receive stock in the reorganized company. The assets of

the retirement plan were turned over to the PBGC, which filed a proof of claim for the full

amount of what it calculated to be the underfunding of the plan — that is, the difference

between the value of the plan assets turned over to it and the present value of the future

payments owed to the beneficiaries of the plan.[1] Following an evidentiary hearing, this court

allowed the claim in full. *In re US Airways Group, Inc.*, 303 B.R. 784 (Bankr. E.D. Va.

2003). No appeal was taken from that ruling, and the PBGC received a distribution of stock

in the reorganized company in satisfaction of its claim.

    As noted, the present chapter 11 case was filed on September 12, 2004. Mr. Tiffany

filed a secured claim (Claim No. 1444) in the amount of $600,000 on December 7, 2004.

---

[1] It is important to note that the PBGC's claim is not restricted to the amount needed to pay the guaranteed benefit but is for the full amount needed to pay the contractual benefit owed to plan participants. Although payment of benefits by the PBGC is guaranteed only up to a certain amount, the PBGC will pay benefits beyond the guaranteed amount to the extent plan assets permit.

2.

That claim was disallowed on August 24, 2005. Order Sustaining Debtors' Second Omnibus Objection to Certain Claims, Ex. C at 13 (Doc. # 2912). In the interim, Mr. Tiffany had filed an administrative claim (Claim No. 5264) on July 22, 2005. The administrative claim is for the same amount, and is based on the same grounds, as the earlier claim. On May 10, 2006, the reorganized debtors objected to Mr. Tiffany's administrative claim as part of its Second Omnibus Objection to Certain Administrative Claims (Doc. # 3955) at 8-9 & Ex. D. The reorganized debtors contend that Mr. Tiffany's claim should be disallowed because it does not constitute an administrative expense and because "there is no legal basis for the Reorganized Debtors' liability on account of such claims."

<u>Discussion</u>

Mr. Tiffany's claim must be disallowed for two reasons. First, the claim does not qualify as an administrative expense claim. Second, the fundamental premise on which the claim is based is incorrect.

A.

As the reorganized debtors correctly observe, Mr. Tiffany's claim is not an administrative expense as defined by Section 503(b) of the Bankruptcy Code. In a bankruptcy case, a court may allow, as an expense of administration, "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." § 503(b)(1)(A), Bankruptcy Code. Administrative expenses are accorded priority in distribution, and are paid ahead of claims having a lesser priority (including general unsecured claims). §§ 507(a)(1) and 726(a)(1).

3

0024-19

Bankruptcy Code.[2]  A request for payment of an administrative expense will qualify if (a) the right to payment arose from a post-petition transaction with the debtor's estate; and (b) the consideration supporting the right to payment was beneficial to the estate of the debtor. *See In re Hemingway Transp., Inc.*, 954 F.2d 1, 5 (1st Cir. 1992).  A claim arises, for administrative expense purposes, when the acts giving rise to the liability occur, even if the payment does not becomes due, or damages are not experienced, until some future time. *See In re The Bentley Funding Group, LLC*, No. 00-13386, 2001 WL 3405425 (Bankr. E.D. Va., Jan. 2, 2001) (where indemnity agreement between bonding company and debtor land developer was entered into prior to the bankruptcy, the bonding company's claim for post-petition costs of completing subdivision improvements was not an administrative expense claim); *In re Dornier Aviation (North America), Inc.*, Nos. 02-82003 and 02-82004, 2002 WL 31999222 (Bankr. E.D. Va., Dec. 18, 2002) (severance pay owned under a prepetition employment agreement was not an administrative claim even though the employee worked for 86 days after the bankruptcy petition was filed).[3]

Mr. Tiffany asserts the basis for his claim to be unpaid compensation for services performed from the beginning of his employment with the debtor on March 2, 1987, to the present.  The specific events giving rise to his claim, however, are the distress termination of

---

[2]  For cases filed on or after October 17, 2005, administrative expenses claims are now subordinate to claims for "domestic support obligations," such as child support and alimony, but remain senior to all other unsecured claims.  Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. 109-8.

[3]  The *Bentley Funding* and *Dornier Aviation* opinions are available on the court's Internet web site at http://www.vaeb.uscourts.gov/opinions/ssm/bentley_axa%20admin%20claim.pdf and http://www.vaeb.uscourts.gov/opinions/ssm/fairchild_neely.pdf.

4

the pilots pension plan and the turnover of the plan assets to the PBGC, both of which

occurred during the first chapter 11 case, and long before the filing of the present case.

While Mr. Tiffany will not experience any actual loss of income from the termination of the

plan until the time he actually retires, his claim for the reduction in retirement

benefits—even if it were allowable as a claim against the debtors—is nevertheless a

prepetition claim and not an administrative expense claim.[4]

## B.

But even if Mr. Tiffany's claim could be construed as arising from a post-petition

transaction with the debtor, it would have to be disallowed because it duplicates the allowed

claim of the PBGC in the prior chapter 11 case and because it proceeds from the incorrect

premise that the funds in the plan belonged to him and the other pilots and should not have been

turned over to the PBGC.

Title IV of the Employee Retirement Income Security Act of 1974 (ERISA) created a

mandatory government insurance program that is administered by the PBGC. The insurance

program was created to protect "private-sector workers participating in covered pension plans

against the termination of their plans before sufficient funds have been accumulated to pay

anticipated benefits." *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 637, 110 S.

Ct. 2668, 2671, 110 L.Ed.2d 579 (1990). Under Title IV of ERISA, when a defined benefit

---

[4] Indeed, since the events giving rise to the claim occurred prior to confirmation of the plan
in the first chapter 11 case, and since confirmation of a chapter 11 plan discharges a debtor
that continues to engage in business from all pre-confirmation claims, § 1141(d),
Bankruptcy Code, the claim now being asserted was allowable, if at all, only in the first
chapter 11 case.

5

002449

pension plan terminates with insufficient assets, the PBGC becomes trustee of the plan and takes over the plan's assets and liabilities. See 29 U.S.C. §1344.

Upon assumption of the plan's assets and liabilities, the employer becomes liable to the PBGC for the "total amount of the unfunded benefit liabilities under the plan (as of the termination date) ..." 29 U.S.C. 1362 (b)(1)(B)(a). The PBGC filed a timely claim in the first chapter 11 case for the unfunded liabilities under the plan, and that claim was allowed in full by this court in December 2003. Any claim by individual plan participants would be therefore duplicative of the PBGC's claim.

To this, Mr. Tiffany rejoins that the debtor had no right to turn over the funds, and the PBGC had no proper claim to them, because the money in the plan belonged its beneficiaries. As noted earlier, however, Congress, through Title IV of ERISA, put forth a comprehensive statutory scheme that governs the transfer of a terminated defined benefit plan's assets from an employer to the PBGC. Because ERISA is controlling, Mr. Tiffany's argument that the plan assets should have been turned over to him and the other plan participants in unavailing.

Additionally, the fundamental premise of Mr. Tiffany's argument—that there are specific dollars in the plan that have his name on them—is incorrect. The Retirement Plan for Pilots of US Airways, Inc., is a defined benefit plan under 29 U.S.C. § 1002(35). A defined benefit plan is a plan that "promises to pay employees, upon retirement a fixed benefit under a formula that takes into account factors such as final salary and years of service with the employer." *LTV*, 496 U.S. at 637, 110 S.Ct. at 2671. Under such a plan, an employee is entitled to a fixed annuity

6

002449    32405002454047

upon retirement for the remainder of the retiree's life.[5] This type of plan does not, however, give an employee ownership over a discrete portion of the plan's assets. An employee is only entitled to the fixed benefit under the plan upon retirement.

ERISA distinguishes a defined benefit plan from a defined contribution plan. *See* 29 U.S.C. § 1002(34). A defined contribution plan is one under which an employer "typically contributes a percentage of an employee's compensation to an account, and the employee is entitled to the account after retirement." *Pension Benefit Guaranty Corp.*, 496 U.S. at 637, 110 S.Ct. at 2671. An example of a defined contribution plan is a 401(k) plan, in which an employee, and not the employer, holds title to and exercises control over the account. ERISA does not insure these types of plans because "employees are not promised any particular level of benefits; instead, they are promised only that they will receive the balances in their individual accounts." *Id.* If the U.S. Airways Pilot's Retirement Plan were a defined contribution plan under 29 U.S.C. § 1002(34), then Mr. Tiffany would be correct in assuming that he is entitled to a fixed portion of the plan's assets. This, however, is not the case. Mr. Tiffany is only entitled to the contractual benefits under the plan, as modified by ERISA upon the plan termination. To allow Mr. Tiffany to assert a claim against the employer to recover the difference between what he would have received under the plan had it not been terminated and what he will receive from



---

[5] The retirement plan for pilots of US Airways did include an option for a pilot, on retirement, to receive a lump sum payment rather than an annuity. The details of how the lump sum was computed are not part of the record before the court, but presumably it represented the commuted value of the annuity. In any event, the fact that a particular defined-benefit plan has a lump sum payment option does not affect the underlying analysis of whether plan participants own the funds in the plan or merely have a contractual right to payment.

7

002449